[Crim. No. 2580. In Bank.—January 21, 1924.]

## THE PEOPLE, Respondent, v. ALVINO MENDEZ et al., Appellants.

[1] CRIMINAL LAW—MURDER—ALIBI—CONFLICTING EVIDENCE.—In a prosecution for murder the circumstance that each of the defendants presented, by several witnesses, an alibi which was substantially perfect upon its face suffices merely to present a substantial conflict in the evidence which could be resolved only by the jurors, who saw and heard the several witnesses and observed their demeanor and manner of testifying.

[2] ID.—INDICTMENT—SUFFICIENCY OF.—Where an indictment for murder as filed bears upon its back the indorsement, "A true bill, P. N. Bucklin, Foreman Grand Jury," immediately underneath which is a printed form of blank indorsement reading, "Presented by the Foreman of the Grand Jury in the presence of the Grand Jury in open Superior Court of the County of Imperial, State of of California, and filed as a record of said court this ―― day of February, A. D. 1923," and immediately thereunder is a blank space for the signature of the county clerk, the fact that the deputy clerk who filed the same, instead of placing in the space

the name of the clerk, together with his own signature as deputy, stamped therein with a rubber filing stamp the words "Filed: February 15, 1923. C. G. Mousseau," under which he placed his signature as deputy, did not render the indictment fatally defective, it being at worst a mere irregularity of procedure, which was not prejudicial to the defendants, no contention being made that the indictment was not in fact presented by the foreman of the grand jury in their presence to the court on the dates indorsed on it and then filed with the clerk.

[3] ID. — INTRODUCTION OF EVIDENCE — ACTION OF COURT — WHEN PROPER.—In this prosecution for murder it is held that the trial court acted with entire propriety in certain instances in the introduction of evidence, which are alleged by defendants to constitute prejudicial error; and the fact that he may have incidentally aided the prosecution is of no consequence.

[4] ID.—TRIAL—SUPERVISION OF JUDGE.—The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered. It is not only the right but the duty of a trial judge to so supervise and regulate the course of the trial that the truth shall be revealed in so far as it may be, within the established rules of evidence.

[5] ID.—CHARGE ON FACTS—CONSTITUTION.—Our constitution expressly forbids judges to charge jurors upon matters of fact, and, in obedience thereto, a trial judge should be rigorously careful not to say or do anything in the course of a trial in the presence of the jurors which may be taken by the latter as an expression of his opinion upon any question of fact in issue.

[6] ID.—MURDER—MISCONDUCT—REFERENCES OF COURT TO CRIME.—In a prosecution for murder, where the sole contention of the defendants was that the deceased was murdered by persons other than themselves, the reference by the court to "the place of the murder" or "the scene of the crime" cannot be held to be prejudicial error, especially where no objection was made at the trial.

[7] ID.—STATEMENTS OF COURT—WAIVER OF OBJECTION.—A defendant who deems himself injured by an act or statement of the trial judge during the trial is not permitted to keep silent in order to speculate upon the verdict and claim redress only after the latter has gone adversely to him.

[8] ID. — WITNESSES — MINOR — COMPETENCY. — In a prosecution for murder there is no error in ruling that a witness nine years old

3.  Admissibility in evidence of photographs, notes, 75 **Am. St. Rep.** 477; 35 **L. R. A.** 802; 51 **L. R. A. (N. S.)** 843.

8.  Competency of children as witnesses as dependent upon age, notes, 124 **Am. St. Rep.** 296; 14 **Ann. Cas.** 3; **Ann. Cas.** 1916C, 424; 19 **L. R. A.** 605.

is competent, where it is not contended he is of unsound mind, and it is apparent from his testimony upon the *voir dire,* as well as upon direct and cross-examination, that he is not incapable of receiving just impressions of the facts or of relating them truly.

[9] Id.—Evidence — Suggestion — Contradictions — Weight. — Objection to testimony of witnesses that it is the result of suggestions by peace officers and others, and is contradictory, goes to its weight, rather than to its admissibility or legal sufficiency, and the weight and credibility of testimony is solely for the jury.

[10] Id. — Butcher-knife — Introduction in Evidence Without Objection.—In a prosecution for murder where a butcher-knife found upon the person of one of the defendants was introduced in evidence with the express acquiescence of defendant's counsel, there was no error in denying a motion to strike it out, which was made some days later.

[11] Id.—Statements by Defendant—Admissibility of.—In a prosecution for murder there is no error in admitting testimony of witnesses as to statements of one of the defendants, which were in no sense confessions, the defendant having first been informed of his legal rights, and a showing being made that the statements were freely and voluntarily made, without any threats or promises, and defendant knowing enough English to understand what was said to him and to express himself intelligently.

[12] Id.—Evidence—Leading Questions—Discretion.—The extent to which leading questions shall be permitted rests in the sound discretion of the trial judge.

[13] Id.—Motive of Third Person—Inadmissibility.—In a prosecution for murder mere evidence of motive in another person, or of motive coupled with threats of such other person, is inadmissible, unless coupled with other evidence tending to directly connect such person with the actual commission of the crime charged.

[14] Id.—Confessions, Threats and Flight.—Confessions, threats, and circumstances of flight on the part of third persons are all in the nature of declarations or admissions of such third persons, and are, therefore, hearsay, unless they come within the *res gestae* exception to the hearsay rule; and they cannot be regarded as a part of the *res gestae* unless and until evidence is produced which has an inherent tendency to connect such persons with the actual commission of the crime.

---

10. Admissibility against defendant of documents or articles taken from him, notes, 15 Ann. Cas. 1205; Ann. Cas. 1915C, 1182; 59 L. R. A. 467; 8 L. R. A. (N. S.) 762; 34 L. R. A. (N. S.) 58; L. R. A. 1915B, 834; L. R. A. 1916E, 715.

12. Power of the court to put leading questions, notes, 6 Ann. Cas, 479; 57 L. R. A. 881; L. R. A. 1916A, 1196.

[15] Id.—Flight of Third Persons—Inadmissibility of Evidence.— In such a case, the mere circumstance that four Mexican laborers, who had been occupying a shack a quarter of a mile from the scene of the murder, quit work on the morning following the homicide and that some weeks later they could not be found, could not be considered as an indication of flight on their part, and evidence of such circumstance was properly excluded.

[16] Id.—Instructions—Separate Elements of Crime.—While it is, generally speaking, the duty of the trial judge to state clearly to the jury the separate elements essential to constitute the crime charged, in a prosecution for murder where it was substantially conceded that the deceased had been murdered and the only issue was whether the crime had been committed by the defendants or others, defendants were not prejudiced by the failure of the court to instruct as to the separate elements constituting the crime.

APPEAL from a judgment of the Superior Court of Imperial County. M. W. Conkling, Judge. Affirmed.

The facts are stated in the opinion of the court.

Wilbur W. Randall and Miller K. Hinds for Appellants.

U. S. Webb, Attorney-General, Erwin W. Widney, Deputy Attorney-General, and Ernest R. Utley, District Attorney, for Respondent.

MYERS, J.—Each of the defendants appeals separately herein from a judgment of conviction upon a verdict of guilty against each of them of murder in the first degree, and from an order denying his motion for a new trial. The evidence produced in behalf of the prosecution was ample, if credited by the jurors, to sustain each of the verdicts. There is no contention herein to the contrary except in one respect, which will be hereinafter mentioned. Assuming, as we must, that the evidence in behalf of the prosecution was given full credit by the jurors, the following is a brief statement of the facts established thereby. Mike Farnesaro was operating a ranch in the Imperial Valley, a few miles from the Mexican boundary line, and was residing thereon with his wife and three children,—Joe, aged nine, Paul, aged seven, and a little girl still younger. On the evening of

15. Presumption of guilt from flight, note, 39 L. R. A. (N. S.) 61.

January 2, 1923, at about dusk, Farnesaro with his two boys was at a haystack about sixty feet from his house pitching hay to his cattle in the corral. Three Mexicans, identified by Joe as these two defendants, and a man named Rubo (or Rubio) came in from the highway, apparently from the south, and asked Farnesaro for work, to which he replied he had none for them. One of the three men had a gun in his hand, and each of the other two had a knife in his hip pocket with the blade projecting upward. They then sought to purchase some bread from Farnesaro, tendering some Mexican coins, which he refused to accept. They then asked where they might find work, to which Farnesaro replied, in effect, that they might find it at the Sample ranch, which lay to the northward. The two little boys then went to the house for supper, leaving their father with the three Mexicans at the haystack. A short time afterward the three Mexicans came into the house, shouting in Spanish, "Money, we want money!" One of them, Cazares, seized the two little boys, threw them upon the bed where the little girl was sleeping, and bound their hands and feet with portions of the bedding. At the same time the other two men seized Mrs. Farnesaro and forced her, struggling, into the adjoining room. Then Cazares with a stick or metal rod beat the three children into a state of insensibility, while the other two men did likewise with Mrs. Fernasaro in the adjoining room. A fourth Mexican, identified by Joe only as a man named Mike, entered the house while this was going on. Some hours later the four men returned to the house and unbound the hands and feet of the two boys upon the bed, and finding Joe returned to consciousness again beat him into a state of insensibility. The crime was not discovered until the morning of the second day following, some thirty-six hours later, when the body of Fernesaro was found upon the ground near the haystack. He had been beaten to death with some blunt instrument. The three children were at that time up and out of the house, but they were in a pitiable condition physically and were mentally irrational. Mrs. Farnesaro was found lying upon the floor of the room into which she had been dragged at the time of the assault, and she was totally unconscious and so remained for several days thereafter. Each of the four had sustained skull fractures and other serious injuries. It does

not clearly appear from the record whether or not anything had been actually stolen from the house, but the entire house had been ransacked. The trunk and the dresser drawers had all been opened and their contents strewed about. Mrs. Farnesaro had had eighty-five dollars in gold coin wrapped in a rag, which she had seized at the entry of the men and kept concealed in her hand during the assault, and which was found underneath her body after the discovery of the crime. Mrs. Fernesaro at the trial identified the defendant Cazares, whom she had previously known, with the utmost positiveness, notwithstanding the fact that he had a handkerchief over the lower portion of his face at the time of the assault. Her identification of Mendez, whom she had not known previously, was much less positive and less convincing, but she did point him out at the trial as one of the two men who had assaulted her. The boy Joe positively identified both defendants, both of whom he had known previously, and his testimony in this respect was not substantially shaken by a severe cross-examination. It is true that he did state at one time that he had never known Mendez until after the latter's arrest, but in response to questions from the court it was made apparent that what he meant thereby was that he had not known Mendez' name until after the arrest; that he had previously been acquainted with the man Mendez, but had been ignorant of his name. [1] The circumstance that each of the defendants presented, by several witnesses, an alibi which was substantially perfect upon its face, suffices merely to present the familiar situation of a substantial conflict in the evidence, which could be resolved only by the jurors, who saw and heard the several witnesses and observed their demeanor and manner of testifying. It may be mentioned that the identification of these two defendants was afforded substantial corroboration by evidence of numerous facts and circumstances subsequent to the crime which tended legitimately to indicate a guilty conscience upon the part of each of the defendants.

[2] There is no merit in the contention that the indictment herein was fatally defective, in that it is not shown to have been presented in compliance with section 944 of the Penal Code. The indictment as filed bears upon its back the indorsement "A true bill. P. N. Bucklin, Foreman Grand

Jury." Immediately underneath the same is a printed
form of blank indorsement reading as follows: "Presented
by the Foreman of the Grand Jury in the presence of the
Grand Jury in open Superior Court of the County of Im-
perial, State of California, and filed as a record of said
court this —— day of February, A. D. 1923." Immedi-
ately underneath the same was a blank space for the signa-
ture of the county clerk. The deputy county clerk who filed
the same, instead of placing in this space the name of the
clerk, together with his own signature as deputy, stamped
therein with a rubber filing stamp the words "Filed;
February 15, 1923. C. G. Mousseau," underneath which
he placed his signature "H. L. Foster, Deputy." There is
no contention that the indictment was not in fact presented
by the foreman of the grand jury in their presence to the
court on February 15, 1923, and filed on that date with
the clerk of the court. Under these circumstances the defect
in the authentication thereof by the clerk, if it be conceded
to be a defect, was nothing worse than a mere irregularity of
procedure which did not operate to prejudice any right of
either defendant.

[3] Both defendants complain that the trial judge
throughout the trial exhibited a bias in favor of the prose-
cution and prejudice against the defendants to their great
injury. It is charged by counsel that "throughout the prose-
cution's case in chief the court has aided the district attor-
ney in presenting his evidence and getting his evidence in;
has aided and assisted in the correction of testimony of the
prosecution's witnesses; has sought to defeat the effect of
the cross-examinations of the defendant by immediately
breaking in upon it, to lead and assist the witnesses in cor-
recting the effect of damaging cross-examinations, and in
numerous other ways caused the jury to be influenced in
arriving at their verdict." We are cited to many instances
appearing in the record as supporting these charges. We
have examined all of them. In many of the cited instances
which give some color of support to these charges, it is
clearly apparent that the trial judge acted with entire pro-
priety. For example, when the district attorney was about
to hand to the jurors for their inspection certain photographs
which had been fully identified, but had not been formally
offered in evidence, the trial judge interrupted and advised

the district attorney to first offer them in evidence, which was done, and they were properly received. In various instances wherein a witness had indicted a location upon a photograph or upon a plat by merely pointing thereto in such manner that the written transcript of his testimony would be unintelligible, the trial court intervened and by questions elicited answers such as would make the record truly reveal what the witness was actually testifying. Other instances occurred while counsel for defendants were endeavoring to impeach the witness Joe Farnesaro by showing conflicts between his testimony at the trial and his testimony at the coroner's inquest, and calling upon him to explain them. This procedure is frequently confusing to a lay witness of mature years and intelligence. In the case of a boy of nine years, who apparently was accustomed to use three languages and had but an imperfect knowledge of either, it was obviously difficult to apply this method without doing an injustice to the witness. When it appeared that the boy was confused in this manner the trial judge would intervene and by questions of his own would help to "straighten out" the witness and clarify his testimony. Upon one or two occasions when counsel read isolated portions of the testimony at the coroner's inquest which apparently conflicted with the testimony at the trial, the trial judge intervened of his own motion, compelling them to read other portions of the context which revealed that the apparent conflict was not a real conflict. In all of these things the trial judge was but doing his duty. The circumstance that in so doing he may have incidentally aided the prosecution is of no consequence. [4] The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered. It is not only the right but the duty of a trial judge to so supervise and regulate the course of a trial that the truth shall be revealed in so far as it may be, within the established rules of evidence. Other instances are cited wherein the trial judge (inadvertently without doubt) apparently overstepped the narrow bounds of strict propriety which the policy of the law prescribes for the conduct of a trial judge. In questions to witnesses he referred to "the place where the murder was committed," "the scene of the crime," "the time the murder was committed," and in discussions with counsel during the

trial as to the admissibility of evidence, he used some ex-
pressions which might be considered as invading to some
slight extent the province of the jury. Of course this should
not be done, but it is frequently difficult to discuss questions
of the admissibility of evidence without using some such ex-
pressions. "Under our system the trial judge is rigorously
prohibited from action or words having the effect of convey-
ing to the jury his personal opinion as to the truth or falsity
of any evidence. The determination of questions of fact
must be made by the jury free from the influence that knowl-
edge of the trial judge's views thereon might have." (*People
v. Soeder*, 150 Cal. 12, 18 [87 Pac. 1016, 1019].) **[5]** Our
constitution expressly forbids judges to charge jurors upon
matters of fact, and in obedience thereto a trial judge should
be rigorously careful not to say or do anything in the course
of a trial in the presence of the jurors which may be taken
by the latter as an expression of his opinion upon any ques-
tion of fact in issue. **[6]** In some cases a reference by
the trial judge to "the place of the murder" or "the scene
of the crime" might be seriously prejudicial to the defendant
charged therewith, but not so in the instant case. The de-
fense of each defendant herein consisted of an alibi and the
claim that the crime was committed by some other person
or persons. No question was made at any point of the trial
that Farnesaro had been murdered. The sole contention of
defendants was that he had been murdered by persons other
than themselves. If the trial judge was indiscreet in this
respect counsel for the defendants were equally so. They
each made repeated references during the trial to "the time
the crime was committed," "the scene of the murder," "the
place where Mike Fernesaro was murdered," etc. In none
of the instances cited, with but three or four exceptions, did
counsel for either defendant make any objection at the trial
to the statement made or question asked by the trial judge,
which is the subject of the present complaint. In the three
or four instances wherein objection was made it was not well
founded and was properly overruled. In all of the other
instances no objection was made or in any way called to the
attention of the trial judge. If objection had been made
the trial judge could, and doubtless would, have promptly
repudiated the intention to indicate any opinion upon the
facts and thus would have effaced from the minds of the

jurors any false impression which they might have gained.
[7] A defendant who deems himself injured by an act or
statement of the trial judge during the trial is not permitted
to keep silent in order to speculate upon the verdict and
claim redress only after the latter has gone adversely to
him.

[8] There was no error in ruling that Joe Farnesaro,
nine years old, was a competent witness. Section 1879 of
the Code of Civil Procedure provides that: "All persons,
without exception, otherwise than as specified in the next
two sections, who, having organs of sense, can perceive, and
perceiving, can make known their perceptions to others,
may be witnesses. . . . " Section 1880 provides: "The fol-
lowing persons cannot be witnesses: 1. Those who are of
unsound mind at the time of their production for examina-
tion. 2. Children under ten years of age, who appear in-
capable of receiving just impressions of the facts respecting
which they are examined, or of relating them truly. . . . "
There is no contention that Joe Farnesaro was of unsound
mind at the time of the trial, and it is apparent from his
testimony upon the *voir dire,* as well as upon direct and
cross-examination, that he was not incapable of receiving
just impressions of the facts or of relating them truly.
[9] The real basis of the complaint of the defendant
Cazares in this respect, as well as of the contention of the
defendant Mendez, that the evidence is insufficient to support
the verdict rests upon the contention that the facts as tes-
tified to by Joe were not facts which he actually remem-
bered, but were things which had been told to him by others
and which he thought he remembered; in other words, that
his testimony was the product of suggestions which had been
made to him by peace officers and others engaged in inves-
tigating the crime and preparing the case for trial. There
is some apparent basis for this contention in the record.
There were material contradictions in his testimony and it
was shown that he had made various statements shortly after
the crime which were completely at variance with his testi-
mony at the trial. The same thing is true to some extent
with respect to the testimony of Mrs. Farnesaro. By way of
explanation thereof it was shown by the testimony of the
attending physician that Joe, by reason of the injuries he
had received, did not fully recover mentally until two weeks

after the crime, and that Mrs. Farnesaro did not return to complete mental normalcy until about six weeks after the crime.. But in any event these objections go only to the weight of the testimony of these witnesses, not to its admissibility or to its legal sufficiency, and the question of the weight and credibility of this testimony was solely for the jurors. The trial court accorded the widest latitude to the defendants in their efforts to discredit the testimony of these witnesses by showing that it was the product of suggestion, and the conclusion of the jurors thereon cannot be disturbed by this court.

[10] The court did not err in admitting in evidence and refusing to exclude therefrom the butcher-knife found upon the person of defendant Cazares at the time of his arrest. It may be conceded that this was not properly admissible if it had been objected to. However, counsel for this defendant not only failed to object to its introduction, but when it was offered in evidence stated to the court, ''There is no objection to it being introduced.'' Having thus received it with the express acquiescence of counsel the court committed no error in denying the motion to strike it out, which was made some days later.

[11] There was no error in admitting the testimony of Gillett and Spencer as to damaging statements made by defendant Cazares. These statements were in no sense confessions. Spencer was not a peace officer at the time. Gillett, who was sheriff, first informed the defendant of his legal rights, and the foundation was laid by showing that his statements were freely and voluntarily made, without any threats or promises, and by a showing at least *prima facie,* that this defendant knew enough English to understand what was said to him and to express himself intelligently.

[12] The extent to which leading questions shall be permitted rests in the sound discretion of the trial judge, and we find nothing herein indicating an abuse of that discretion. We find no evidence in the record to support the claim of ''misconduct of newspapers.''

We come now to what is, perhaps, the most serious contention raised upon this appeal. It is that the court erred in excluding testimony which, in the language of counsel, ''would have proved that the deceased had been, just prior to his death, involved in difficulties with (1) Mike Amarillas,

an employee, who threatened to kill deceased two weeks before the homicide; (2) with Giorgio Brokerage Company, whom deceased had sued for three thousand dollars; (3) with Vasquez et al., over the tomato crop and purchase of a heifer which deceased by force took from the possession of Vasquez et al., after part of purchase was paid; (4) with four Mexicans who lived on deceased's ranch one-fourth of mile from the house of the homicide, at the time of killing, with whom deceased had serious trouble a few days before his death; . . . that on New Year's day at noon hour the deceased came to the shack occupied by the four Mexicans on the Farnesaro ranch just across the road from the Sample ranch house and demanded pay from one of the Mexicans for damages done by a horse breaking into barley, and failing to collect the money deceased confiscated the horse, leading it home with him; that while at the shack deceased laid claim to two horse blankets, upon which two Mexicans slept; that upon leaving the said shack, deceased ordered all the occupants to move from said house immediately; that four men quit work on the Sample ranch at 9 o'clock A. M. on the third day of January, 1923, demanded their pay, and went across into Mexico, and when later searched for could not be found; that the description of three of said men was identical as to person and clothing with the description of the three at the homicide," and that on January 2d the deceased turned the flow of irrigating water into the field in which the shack was situated, with the result that the Mexicans were flooded out of the shack some time during the night following. The trial court did in fact admit the evidence offered in support of the contentions numbered 1, 2, and 3, *supra*, and admitted some of the evidence offered in support of number 4, but rejected much of the latter. Evidence was received showing that at the time of the homicide and for some time prior thereto sixteen Mexicans were occupying a shack upon the Farnesaro ranch a quarter mile north of the place where decedent was living and were employed upon the Sample ranch, which was across the road therefrom; that on the morning of January 2d deceased turned the irrigating water into the field wherein this shack was located, with the result that some time during that evening and night the field became flooded to an extent which rendered the shack untenantable. The court excluded

the offered testimony relative to controversies over the horse and the horse blankets and testimony offered to show that at 9 A. M. on January 3d four Mexicans employed at the Sample ranch quit work, and that the descriptions of three of them corresponded with the descriptions previously given in evidence of the three Mexicans who committed the assault. The trial court expressed the view that evidence tending merely to show that persons other than the defendants may have had a motive for the commission of the crime was inadmissible unless coupled with other evidence having an inherent tendency to connect such other persons with the actual commission of the crime. He excluded the testimony as to the descriptions of the three men who quit work upon the following morning, upon the ground that the proffered descriptions were so general and indefinite that they would apply equally to hundreds of persons. Defendants' counsel conceded this to be the fact. **[13]** We are inclined to agree with these conclusions of the trial judge. We do not find any California case directly in point upon the question whether evidence of motive upon the part of some one other than the defendant for the commission of the crime charged is admissible, in the absence of other evidence tending to connect such other persons with the commission thereof. ''It is always proper to show that some other person and not the defendant committed the crime with which he is charged.'' (*People* v. *Mitchell*, 100 Cal. 328, 333 [34 Pac. 698, 700].) The question herein is what kind and quality of evidence is essential to that end, and upon this question we have received no assistance from counsel. It seems clear that a defendant, in order to exculpate himself, should not be required to establish the guilt of a third person with that degree of certainty requisite to sustain a conviction of the latter. On the other hand, it seems equally clear that evidence which simply affords a possible ground of possible suspicion against another person should be inadmissible. The decisions in other states are not completely harmonious upon this question. But they are substantially unanimous in holding that mere evidence of motive in another person, or of motive coupled with threats of such other person, is inadmissible unless coupled with other evidence tending to directly connect such other person with the actual commission of the crime charged. (See notes to 1 Wigmore on Evi-

dence, 2d ed., secs. 139–142.)   The learned author criticises the rationale of these decisions somewhat severely, but concedes that they are substantially unanimous upon this point. It seems to us that there is a sound basis for this rule and that it rests fundamentally upon the same consideration which led to the early adoption of the elementary rules that evidence to be admissible must be both relevant and material.   It rests upon the necessity that trials of cases must be both orderly and expeditious, that they must come to an end, and that it should be a logical end.   To this end it is necessary that the scope of inquiry into collateral and unimportant issues must be strictly limited.   It is quite apparent that if evidence of motive alone upon the part of other persons were admissible, that in a case involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased; that a great many trial days might be consumed in the pursuit of inquiries which could not be expected to lead to any satisfactory conclusion.

[14]   This brings us to the inquiry whether the claimed circumstances of flight above referred to would constitute such additional evidence as would render the evidence of motive admissible.   We do not think so.   Circumstances of flight are in the nature of confessions by such third persons and are, therefore, in the nature of hearsay evidence. Evidence, even of express confessions of third persons, is generally held inadmissible, in the absence of other evidence tending to connect such other persons with the crime.   (See cases in notes cited *supra.*)   Confessions, threats, and circumstances of flight on the part of third persons are all in the nature of declarations or admissions of such third persons and are, therefore, hearsay, unless they come within the *res gestae* exception to the hearsay rule.   It does not seem to us that they may be justly regarded as a part of the *res gestae* unless and until evidence is produced which has an inherent tendency to connect such persons with the actual commission of the crime.

[15]   In the instant case the trial judge expressed the opinion that the mere circumstance that four Mexican laborers quit work upon the morning following the homicide

and that some weeks later they could not be found could not be considered as an indication of flight on their part. He stated, in substance, apparently as a matter of common knowledge, that there were at that time in Imperial Valley thousands of itinerant Mexican laborers, who were continually seeking work, obtaining work, quitting and moving on, and who were constantly passing and repassing the Mexican boundary line, which was but a short distance away. The truth of this statement was not challenged by the defendants either in the court below or in this court. But whether or not those facts were of such common knowledge as to be judicially cognizable, we are of the opinion that the trial court committed no error in rejecting the proffered testimony.

There is no merit in the contention that the proffered evidence sufficiently connected the three Mexicans with the commission of the crime by showing that they were "in the vicinity thereof" at the time of its commission. No evidence was proffered showing that they were in such vicinity except the evidence that they had been occupying the shack a quarter mile away. If, for example, it had been shown that these men lived ten miles away and had been seen on the evening when the crime was committed within a quarter of a mile from the place of its commission, with nothing to explain their presence there, this might perhaps be regarded as tending sufficiently to connect them with the crime to render evidence of their *animus* admissible. But such is not the case here.

[16] We have examined the instructions given and find no substantial error therein. Nor do we think that the jurors could have been misled by anything said therein when all of the instructions are considered together in the light of the issues and the evidence. We do not think that the defendants could have been prejudiced by the rejection of the proffered instruction defining the different elements of the crime charged. It is, generally speaking, the duty of the trial judge to state clearly to the jury the separate elements essential to constitute the crime charged. But, as pointed out above, in the instant case the fact that Farnesaro had been murdered was substantially conceded, and the only real issue which the jury was called upon to resolve was whether the crime had been committed by these

defendants or by someone else. Under these circumstances defendants cannot be held to have been prejudiced by the failure of the court to instruct as to the separate elements constituting the crime. The remaining instructions rejected were sufficiently covered by the instructions given.

We cannot conclude that there has been any miscarriage of justice herein, and the judgments and orders appealed from are hereby affirmed.

Lawlor, J., Waste, J., Kerrigan, J., Seawell, J., Wilbur, C. J., and Lennon, J., concurred.