Filed 7/30/24  P. v. Wight CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARVIN MEYER WIGHT,<br><br>    Defendant and Appellant. | D081663<br><br><br>(Super. Ct. No. SCN414179) |


APPEAL from a judgment of the Superior Court of San Diego County, Michael D. Washington, Judge.  Affirmed.

Eric Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Marvin Meyer Wight was charged with the willful, deliberate, and premeditated attempted murder of Kristina M. (Pen. Code, §§ 187(a), 664; count 1) and possession of a firearm by a felon (§ 29800(a)(1); count 2).  A jury

convicted Wight of count 2 but hung 11 to 1 for guilt on count 1. At a retrial, a jury convicted Wight on count 1. Wight raises three issues on appeal.

First, Wight argues the trial court deprived him of his right to present a defense by excluding third-party culpability evidence and refusing to instruct the jury on third-party culpability. We conclude (1) the court did not abuse its discretion in finding the pretrial evidence insufficient to link a third person to the shooting, and (2) Wight forfeited any argument that the evidence during trial was sufficient to instruct the jury because he did not renew his request. Any error was nonetheless harmless given the strong evidence against Wight.

Second, although he concedes Kristina's incompetence to testify, Wight contends the court erred in excluding evidence regarding her ability to respond to questions about the incident for the purpose of showing the investigation was flawed in failing to explore her as a source of information. Given Kristina's incompetence, the court did not abuse its discretion in excluding this evidence, and its ruling did not preclude defense counsel from arguing detectives should have asked such questions.

Third, Wight argues the court erred in admitting evidence of his prior drug convictions. We determine the court did not abuse its discretion in admitting sanitized versions of Wight's prior convictions for purpose of showing his motive to shoot Kristina.

We thus affirm the judgment.

I.

The jury convicted Wight of shooting Kristina after a failed attempt to transport drugs from Mexico to San Diego.

2

## A.

In May 2020, Toni Leonard and Jason Walker traveled from Tennessee to San Diego seeking cheap methamphetamine to resell. After buying some from Kristina, they wanted more, and Kristina introduced them to Wight. The group decided Leonard would drive drugs across the border.

On May 22, Leonard drove into Mexico and met with Wight. Men loaded drugs into Leonard's car. Leonard and Wight then drove to the border, where Wight walked across due to his criminal record.

When Leonard applied to enter the United States, border officers directed her to secondary inspection. She called Wight, then back in the United States with Walker, to inform him. She put her phone on speaker so they could hear what was happening, but later learned from Walker that they were not able to hear anything. At secondary, officers discovered 23 pounds of methamphetamine in the car and held Leonard until the following morning.

By the time border officers released her, Leonard's phone battery was dead. She bought a charger and called Walker, who was alone at a motel. She then called Wight and told him what happened. Leonard rideshared to the motel. Walker then sent Wight a picture of Leonard's paperwork to prove her arrest. Wight responded Leonard was in the clear.

## B.

While Leonard was being held at the border, Kristina was shot.

In the early hours of May 23, Kristina called her husband and said she was in trouble. She also texted her husband's roommate that Leonard and Walker "ran off with the dope."

A few hours later, Kristina called the roommate to say "she was going to meet up with somebody" at a gas station and wanted him on the phone "in

case something happened." Kristina's husband and his roommate listened as the person Kristina met with was "yelling at her, screaming, very irate, very impatient with his tone demanding to know where some people were." Kristina said she "didn't have nothing to do with it" and "she knew where the girl [Leonard] was and had all the information." Kristina begged the person to give her a chance and screamed; then the phone went silent. Kristina's husband and his roommate rushed to the gas station and found her bleeding and unresponsive.

Kristina was shot through the head. Law enforcement found a .45 caliber shell casing in her car. A search of Wight's apartment uncovered the same brand and caliber of ammunition.

C.

There is no dispute Wight drove to meet Kristina at the gas station, but he claimed someone else shot her. The station's surveillance footage showed Kristina's car park one space away from Wight's. A figure exited Wight's car and walked to Kristina's. After about five minutes, the figure started to walk away, returned to close Kristina's door, and then got into Wight's car, which drove away.

On Wight's cell phone, law enforcement recovered a deleted audio recording of the shooting. An investigator familiar with Wight's voice from listening to his recorded jail calls identified Wight as the other voice speaking to Kristina in the recording. In closing, the prosecutor argued Kristina can be heard referring to the person she is talking to as "Uce." A witness testified "Uso" is a common term used to refer to "Samoans." Wight, "born and raised in Tonga," was listed in Kristina's phone as "Uso." This recording was not admitted at the first trial because it was discovered during the retrial. The

4

recording was played for the jury, which asked for a speaker to better "hear the voices" during deliberation.

## D.

Wight testified in his own defense. He said Kristina helped him find drivers when he began smuggling drugs. However, he was adamant the methamphetamine in this case was not his and instead was for Kristina and the "Tennessee people."

Wight testified that stealing in the "drug-transportation world" is "absolutely not" tolerated, but if someone "lose[s] a load," the person would not be in trouble if they showed proof of a "lockup report." The cartel "might have you do a free run . . . to make up for" losing their drugs.

According to Wight, when Leonard called about being sent to secondary, he told her not to worry, that border officers would "book-and-release" her, and that he would get her a lawyer. After Wight told the cartel, they followed the standard practice of placing him on "time out," meaning he was "not allowed to cross any more drugs" until the cartel confirmed the drugs were not stolen.

Early the morning of the shooting, a cartel representative named "Chuy" showed up at Wight's house to "shadow" him and confiscated his cell phones. Wight later drove with his roommate and Chuy to collect money from unrelated drug deals.

According to Wight, Chuy instructed him to contact Kristina so Chuy could question her. Wight drove his car to the gas station, with his roommate in the passenger seat and Chuy in the back. Wight testified that when Kristina's car arrived, Chuy got out of the car to talk to her, but "I did not see it happen. I heard something. I was in my car . . . . Chuy shuts the door and comes back and gets in my car. I pretty much knew what happened then."

He did not confront Chuy because he was only thinking "to get the hell out of there because of what just happened." Wight admitted his actions "look[ ] really bad," but he insisted he did not know what was going to happen. He insisted it was not his voice in the recording found on his phone.

Once Wight, his roommate, and Chuy were back at Wight's house, Wight received documentation from Walker of Leonard's arrest. Chuy ended Wight's timeout and returned his cell phones. Wight then drove to Mexico to complain to the cartel that "what just happened was not supposed to happen." Upon returning to the United States, he checked for warrants for his arrest to "make sure [Leonard] didn't tell on [him] when she got busted."

## E.

In social media messages sent after the shooting, Wight said he needed to borrow money, he was "broke," and he needed $1,800 because "he made an investment that went bad." He also said "his folk had put him on time out because of what he had lost."

A drug trafficking expert for the prosecution testified that Mexican drug cartels do not smuggle their own drugs. Instead, they entrust the drugs to third-party individuals who would "either purchase the drugs themselves, be fronted the drugs, or would go in with others to purchase the drugs." If the drugs were discovered and confiscated, the person entrusted with the drugs was responsible for the value of the lost product.

## II.

Wight raises three main issues on appeal.

## A.

First, Wight contends the trial court erred in declining to admit third-party culpability evidence and so instruct the jury. The court made its in limine ruling, however, "based on . . . the current state of the evidence," as it

6

was not clear if the defense witness would sufficiently describe or identify a specific third person.  We see no abuse of discretion in this ruling.  Wight forfeited his challenge to any error based on the evidence at trial because he did not renew his requests after providing the specificity the trial court required.  Even if Wight did not forfeit his challenge, he fails to show prejudice because the court instructed the jury on reasonable doubt and the evidence against him was overwhelming.

We review the trial court's decision to admit or exclude evidence for abuse of discretion.  (*People v. Dworak* (2021) 11 Cal.5th 881, 895.)  To be admissible, third-party culpability evidence "need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.  At the same time, we do not require that any evidence, however remote, be admitted to show a third party's possible culpability." (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).)  Evidence of another person's mere motive or opportunity to commit the crime, "without more, will not suffice"; instead, there must be "evidence *linking the third person to the actual perpetration of the crime*." (*Ibid*., italics added.)  While a defendant need not establish the third person's guilt, "exculpatory evidence pointing to that person should not be admitted if it 'simply affords a possible ground of possible suspicion[.]'" (*Id.* at p. 832, quoting *People v. Mendez* (1924) 193 Cal. 39, 51.)  These limits stem from the requirement that evidence be both relevant and material to be admissible. (*Hall*, 41 Cal.3d at p. 832.)

1.

During motions in limine, Wight sought to present evidence that Kristina's ex-boyfriend shot her.  Wight argued there was evidence of domestic violence, Kristina's ex-boyfriend was in the area at the time of the

7

incident, and Kristina was scared of him. Defense counsel represented Wight's roommate would testify that he was with Wight in Wight's car at the time of the shooting along with a third person who "got out of the backseat" and "walked over and shot" Kristina. It was unclear whether Wight's roommate could name Kristina's ex-boyfriend but he would provide a physical description of "a man."

On appeal, Wight argues the fact his roommate might not have been able to identify the third person by name was "irrelevant to the admissibility of the evidence that there was a third party at the scene who committed the murder." He fails to address, however, the court's legitimate concern with Wight's offer of proof that the description his roommate would provide—tall, thin, with hair—did not match Kristina's ex-boyfriend, who had no hair. The court clarified that it was not requiring the roommate to name the ex-boyfriend; however, if he could not even identify the ex-boyfriend by his description, the evidence was too remote and nonspecific to connect him to the shooting. The court stated the roommate could provide the missing link if he described someone that fit the ex-boyfriend's description.

Defense counsel also argued for the admission of third-party culpability evidence relating to the cartel, but similarly informed the court he could not provide a specific cartel member's name, description, or DNA. The court acknowledged that arguably all drugs can be traced to the cartel but explained there needed to be evidence to connect the cartel directly to Kristina's attempted murder. The court clarified Wight's roommate "might take the stand" and provide testimony sufficient for the court to revisit the issue, "[b]ut absent that or absent some other forensic evidence that would tie someone else to the crime," there was insufficient evidence to raise a reasonable doubt of Wight's guilt.

8

We see no abuse of discretion in the trial court's decision to exclude third-party culpability evidence relating to Kristina's ex-boyfriend or the cartel based on the state of the evidence pretrial. Wight's offer of proof as to his roommate's testimony became irrelevant when he failed to appear. The in limine colloquy, however, remained relevant when Wight, as he describes it, "testified to the identical scenario that counsel had intended to present through" his roommate. In fact, Wight testified with more specificity than offered pretrial: he said the third party who shot Kristina was a cartel representative named Chuy, a dark, "Mexican kind of guy" with a ponytail.

Wight contends the court's pretrial ruling foreclosed defense counsel from arguing Chuy was the shooter and limited him to oblique references to a third party—i.e., "and now the shooter is sitting directly behind [Wight]." He also claims the court's ruling "precluded other defense evidence, such as a gang expert to testify that the type of post-seizure response testified to by [Wight] was in fact a common practice." Defense counsel did not, however, seek to admit corroborating evidence or otherwise renew his request to admit third-party culpability evidence as to the cartel following Wight's testimony. Likewise, he did not renew his request for the court to so instruct the jury. "A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling *in the changed context of the trial evidence itself*." (*People v. Holloway* (2004) 33 Cal.4th 96, 133, italics added.) Wight therefore forfeited these issues.

Wight disputes forfeiture by asserting "the court limited the potential grounds for changing its ruling to (1) '[the roommate] might take the stand'; or (2) 'some other forensic evidence that would tie someone else to the crime.'"

9

Because neither of these scenarios arose, Wight contends he was "stuck" with the court's ruling. We disagree. The court made these comments in response to Wight's offer of proof and argument during the pretrial hearing but did not limit its willingness to revisit the issue to those circumstances. Instead, the court explained numerous times the standard for third-party culpability evidence and instruction and the required specificity. It also made clear its ruling was based on the current state of the evidence.

2.

Even if Wight did not forfeit these issues, any error in foreclosing defense counsel from "arguing directly" that the shooter was Chuy or in refusing to instruct the jury on third-party culpability was harmless because of the overwhelming evidence against Wight. There was no dispute Wight was at the scene of the shooting, and the same ammunition used to shoot Kristina was found in his apartment. He confessed that he left the scene, fled to Mexico, and checked for warrants for his arrest. Most significant was the audio recording of the shooting on Wight's phone. Wight testified it was not him on the recording, while the prosecution presented evidence that it was his voice. Because Wight testified, the jury could decide the issue itself, and it found it was him.

Additionally, the jury was instructed on reasonable doubt, giving the defense "ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*People v. Hartsch* (2010) 49 Cal.4th 472, 504.) Wight testified that Chuy shot Kristina, and defense counsel argued "the shooter [was] sitting directly behind [Wight]" and the prosecution had "the wrong person." The jury rejected Wight's testimony and the defense's version of the events. As such, the limitation on third-party culpability evidence or

10

instruction was harmless under the standard of either *People v. Watson* (1956) 46 Cal.2d 818 or *Chapman v. California* (1967) 386 U.S. 18.

Wight claims the fact the first jury hung on the attempted murder charge shows prejudice, given the court gave a pinpoint instruction on third-party culpability at the first trial. However, the jury hung 11 to 1 for guilt. More importantly, the evidence against Wight was stronger in the second trial because the audio recording of the shooting had not been discovered and thus was not introduced at the first trial, nor did Wight testify. Wight also claims that during the second trial, the jury requested to review the evidence that most strongly supported third-party culpability—Wight's testimony and the audio/visual evidence of the shooting, including the audio recording from Wight's cell phone. To the contrary, that was arguably the strongest evidence of Wight's guilt.

Thus, to the extent Wight's third-party culpability claim is not forfeited, any error was harmless. Either way, he is not entitled to relief.

B.

Second, Wight argues the court erred in excluding evidence Kristina "had the capacity to respond to questions about the case and did so." He concedes Kristina was not competent to testify but argues evidence regarding her ability to communicate "was essential" to the defense contention that the investigation was flawed, overly focused on him, and blind to Kristina as a source of information. The court's ruling, however, did not foreclose this argument. Indeed, Kristina's father and his fiancée both testified about Kristina's ability to communicate. The court did not abuse its discretion in excluding evidence regarding Kristina's ability to communicate *about the case*, however, given the court's concern regarding her lack of competency to testify.

11

A person is disqualified to be a witness if "[i]ncapable of expressing himself or herself concerning the matter so as to be understood" or "[i]ncapable of understanding the duty of a witness to tell the truth." (Evid. Code, § 701(a)(1) & (2).)

As Wight concedes Kristina was not competent to testify, he cannot claim Kristina understood the duty to tell the truth or was able to express herself so as to be understood. Nonetheless, he argues the court should have admitted evidence regarding Kristina's ability to communicate the identity of her shooter. Specifically, he takes issue with the following exchange between defense counsel and Kristina's father's fiancée:

> Q. . . . you've had conversations with [Kristina] about the incident that wound her up in that facility?
> A. Yes.
> Q. And ma'am, you've asked her specifics about what happened?
> A. Yes.
> Q. And you've actually given her names?
> A. Yes.
> Q. And [Kristina] was able to respond to those names and those questions that you posed to her?
> [Prosecutor]: Objection. Hearsay.
> The Court: Sustained. Don't answer.

Wight argues the court erred in not allowing the fiancée to answer because the question did not call for hearsay, as it sought not the content of Kristina's response but rather a showing "that she had the capacity to respond to questions about the case and did so." The court, however, had excluded "any testimony regarding any of [Kristina's] responses to any of the questions that were asked of her regarding anything that took place in this case, including who fired the handgun into her skull." The court was concerned there was a lack of foundation for such testimony given Kristina

12

was not able to give competent testimony.  We find no abuse in the court's discretion in excluding evidence regarding Kristina's ability to communicate *about the case*.

Wight claims that evidence regarding Kristina's ability to communicate about case-specific facts "was essential" to the defense contention that the investigation was flawed.  We are not convinced.  On cross-examination, the prosecution's detective testified that based on his assessment, including from visiting Kristina "a couple months" before trial, her answers to questions were not "based in reality," and he did not ask her any case-related questions because he did not have confidence in her ability to respond appropriately.  The court allowed Kristina's father and his fiancée to testify that Kristina could communicate "yes" or "no" with a thumbs up or down, "gives the middle finger," and could say some words like "ma" and "pa," and some of the alphabet.  They also testified she could play dice and understood when she won or lost.  Based on this, defense counsel could thoroughly argue the investigation was flawed and blind to Kristina as a source of information.  Indeed, Wight concedes defense counsel did argue this point to the jury, stating: "No investigation.  Nobody went to ask her, 'Is this the person who shot you?'  Well, her parents apparently did."  Evidence Kristina had the capacity to respond to questions about the case would have added nothing more to the defense argument that the detectives should have asked her those questions.

The trial court did not abuse its discretion in excluding this evidence.

C.

Third, Wight contends the court erred in admitting evidence of his two prior drug convictions to show his motive to shoot Kristina.  We disagree.

13

Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove the defendant has a criminal disposition or a bad character, but it is admissible if relevant to prove a material fact at issue other than criminal propensity. (Evid. Code, § 1101(a); *People v. Demetrulias* (2006) 39 Cal.4th 1, 14.) Such evidence is admissible to prove, among other things, the defendant's motive or intent, identity, or the existence of a common plan or scheme. (§ 1101(b).) Its admission must not be unduly prejudicial, confusing, or time consuming. We review rulings on relevance and admission of evidence under section 1101 for abuse of discretion. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1114.)

Here, the prosecution moved to admit evidence of Wight's two prior convictions for possession of methamphetamine for sale. The court acknowledged the prosecution's theory that Wight had "a motive to either find out what had happened to the drugs that were delivered to another third-party individual or to find out where that third-party individual was." The court reasoned Wight's involvement in other cases with the same type of drug "helps substantiate that motive that he might have to commit this crime." Defense counsel expressed concern with details of the prior convictions, including that Wight had dynamite and firearms and had indicated he would hurt the police. The court sanitized any mention of Wight's threats or the dynamite but ruled his prior possession of a firearm was "relevant and potentially probative" given the "allegation that [Wight] was . . . in possession of a firearm at the time that this crime in the present case was committed."

At trial, a law enforcement official testified that in 2011, detectives discovered 400 grams of methamphetamine and two sawed off shotguns in Wight's home. During a recorded jail visit, Wight told his brother he had

14

more methamphetamine in a hidden compartment of a car. In a subsequent search, police found that methamphetamine as well as semiautomatic handguns.

Another law enforcement official testified that in 2015, Wight fled from a traffic stop. The officer responded to the location where Wight's unoccupied car was located, and with the assistance of other officers used a canine unit to corner Wight. When Wight refused to cooperate, another officer tased him and took him into custody. Officers found approximately 885 grams of methamphetamine nearby, as well as ammunition in Wight's car.

During closing, the prosecutor argued these prior convictions were relevant to show Wight's motive to shoot Kristina, because "he'll do anything to protect and keep his methamphetamine," and "all the efforts that he'll go to . . . keep his drugs, to hide his drugs, to get them back, he'll evade the police, he has firearms and ammunition—all the efforts and lengths he goes to . . . keep his drugs and protect his drugs."

Wight argues the trial court erred in admitting this evidence to show motive because he was on trial for attempted murder, not smuggling drugs, and neither of his prior convictions involved a violent attack on another drug trafficker for mishandling a drug transaction. However, while the relevance of uncharged misconduct to show identity, intent, or the existence of a common design or plan is determined by the degree of similarity between the prior conduct and the charged crime, no similarity is required for evidence of prior conduct to be admissible to show motive. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018.) Instead, there need only be a nexus between the prior and current offense, "but such linkage is not dependent on comparison and weighing of the similar and dissimilar characteristics of the past and present crimes." (*Ibid.*)

Wight urges there was nothing in the circumstances of the prior convictions to support an inference he "was a gun-toting drug enforcer." Nonetheless, they supported a reasonable inference that Wight had a motive to shoot Kristina given the prior lengths he had gone to protect drugs in his possession.  Contrary to Wight's claim that the evidence was unduly prejudicial because it established him "as an inveterate and unrepentant drug dealer," the trial court appropriately sanitized the most inflammatory parts of his past conduct and admitted no evidence of Wight being violent or injuring anyone.  Accordingly, the court did not abuse its discretion in admitting the sanitized versions of Wight's prior drug convictions.

### III.

The judgment is affirmed.

CASTILLO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

RUBIN, J.