[Crim. No. 947.   Fourth Dist.   Apr. 2, 1954.]

THE PEOPLE, Respondent, v. NED P. EADS, Appellant.

Glenn C. Ames for Appellant.

Edmund G. Brown, Attorney General, Elizabeth Miller, Deputy Attorney General, William O. Mackey, District Attorney (Riverside), and Byron Morton, Deputy District Attorney, for Respondent.

BARNARD, P. J.—The appellant, one Bilbrey, one Parker, and a man using the name of Alvin Shaw, were jointly charged with conspiring to violate section 67 of the Penal Code, it being charged that they entered into a conspiracy to offer a bribe to the sheriff of Riverside County with intent to influence him to permit them to unlawfully conduct a gambling establishment. As an overt act it was charged that on January 20, 1953, they offered $500 to the sheriff to be delivered to him on January 23 or 24, and to deliver other sums as they were permitted by him to engage in gambling activities in that county. In a second count, they were charged with offering a bribe on January 20, 1953, with the intent to influence the sheriff in respect to permitting them to unlawfully operate a gambling establishment. A jury found Parker not guilty, found Eads, Bilbrey and Shaw guilty on count I, and failed to agree on a verdict on the second count. Eads has appealed from the judgment, and from an order denying him a new trial.

The trial took five weeks and the record is voluminous. The sufficiency of the evidence is not attacked, and only a general statement of the factual background will be made. On December 31, 1952, a deputy sheriff received a telephone call from the Los Angeles Police Department calling his attention to Shaw. After making some inquiries he asked one Franks, a deputy constable at Palm Springs, to watch for Shaw, to report, and to "work on it," if he heard anything. On January 3, the appellant, who is a lawyer, approached Franks in Palm Springs, and told him that he was looking around with an eye to opening a gambling business. After saying "every police officer has a price," the appellant asked Franks if he could do him any good with the county or city fathers with respect to opening up gambling. Franks answered that this was possible, and the appellant called Shaw on the telephone. Shaw came over and in a conversation with Franks asked him if he could do any good with the county officers; said they would like to open up a gambling house; and told Franks that in return for his services "We will give you a piece of the business." Franks pretended to acquiesce, and Shaw then told Eads that he had offered Franks "a piece of the business if he could fix it with the sheriff or the county authorities." The appellant said: "I think that is a very fair offer." Shaw then said that they were leaving for Los Angeles and if Franks had anything to report he should call or fly up at their expense. The appellant handed Franks his card and said "Call me at these numbers." Franks reported this conversation to two of the sheriff's deputies.

On January 4, Franks told Shaw and the appellant that he had contacted the man who controlled the area between Palm Springs and Indio, and Shaw said, "Fine." Franks related this conversation to the two deputies, and they instructed him to find out more about the project. On January 10, Franks told Shaw that things looked good, and said he had incurred some expense in travel and in entertaining contacts. Shaw said they would take care of this, and said the appellant had advised him not to meet with the contacts Franks had lined up, but to deal directly with Franks as he was the pay-off man. Franks reported this conversation to the deputies, and received further instructions. On January 13, Franks told Shaw that he had some good "nibbles," but the sheriff wanted to know what type of game was to be run and where in the county it would be. Shaw said he would talk

to the appellant and contact Franks in a few days. On January 15, Franks met Shaw and Bilbrey in Palm Springs. Franks told Shaw that the sheriff wanted $1,500 in advance and Shaw said he did not think that the "corporation" would go for that; that they wanted it on a percentage basis. Bilbrey said "I think that's a fair offer" and that he thought the corporation would pay the $1,500 in advance. Shaw told Franks to itemize his expenses and they would give him a check. On the same day, Franks reported this conversation to the deputies.

On January 18, Shaw and Parker came to Franks' home where a deputy sheriff, concealed in a broom closet, turned on a tape recorder and listened to the conversation over ear phones. Franks told them things were practically lined up, but the sheriff wanted a few details ironed out. Shaw stated that they wanted the sheriff to work on a percentage rather than a weekly basis, that the sheriff could make as much as $1,500 a night, and that a man from the sheriff's office could count the money every night. Franks told them that the sheriff would like to meet Shaw and his attorney, Eads, in his office, and Parker said he thought this was a good idea. On January 19, Shaw phoned Franks from the appellant's office and told him he was going in to see the sheriff. Franks called the sheriff and reported what Shaw had said. Shaw and Bilbrey came into the sheriff's office that afternoon and the conversation was taken down by means of a concealed microphone and a tape recorder. Among other things, the sheriff told them that he wanted to talk to Eads, and that he wanted to know how the matter of income taxes would be handled. Shaw expressed a willingness to pay $1,500 in advance, and said he would bring Eads the next day.

On January 20, Shaw, Bilbrey and the appellant went to the sheriff's office, and the conversation was taken down on the tape recorder. The appellant told the sheriff that Shaw was the head of the organization and advised the sheriff to handle the income tax matters by paying all bills in cash, getting a safety deposit box, and being careful not to make any noticeable increase in his style of living. He also said they were going to keep this operation small and quiet and not play it wide open saying: "That is what blew up last time, if you remember, in San Bernardino." When the sheriff asked "Have you got any money on you now to cinch this thing" the appellant said, "Well, if you need some front

we could bring some out tomorrow or the next day." Shaw said they would give the sheriff $500 and as soon as they were running they would give him another $1,000. When the sheriff asked when the money would be paid Shaw replied "Friday or Saturday." The sheriff then drew a gun, and the men were arrested. The appellant then asked the sheriff to "Let me off this hook." When the sheriff refused, the appellant said: "Because it is going to blow me up out of the water . . . you know that."

The appellant's first contention is that the court erred in not permitting his counsel to cross-examine the sheriff, after an opportunity to hear the tape recordings. The sheriff was called as a witness on April 21. On April 22, after an examination on *voir dire*, the tape recordings were admitted into evidence without objection. It was then adjournment time, and counsel asked to be allowed to play the recordings before they were played to the jury. The court denied this request, on the ground that the tapes might be broken and that they must remain in custody of the clerk, but stated that counsel for defendants might examine the tapes after they were played to the jury. The next morning the tape recordings were played for the jury over an objection that counsel had not been allowed to hear them and that the witness had not been qualified as an expert in running such a machine. The court offered to allow counsel to select another operator and run the tape again for the jury, if desired. When the direct examination of the sheriff was finished on April 27, counsel for appellant stated that he had no cross-examination. After adjournment that day the court announced that, at their request, he had arranged to have the recordings played for defendant's counsel. The examination of witnesses continued for several days and the People rested on May 11.

Counsel for the appellant then asked that the sheriff be recalled for "further cross-examination," saying that he could not cross-examine before he heard the recordings, and that he wanted the sheriff to explain some differences between the recordings and the notes used by him. It is now contended that the denial of this request was an abuse of discretion. Some two weeks had elapsed after the witness left the stand, and no satisfactory reason is given for the long delay, or for the failure to make a timely request that cross-examination be deferred until counsel had again heard the recordings. Nothing is stated as to what the discrepancies are claimed to be, or their materiality. If such discrepancies

existed they would furnish proper ground for argument to the jury but not with the witness. No prejudicial error appears.

It is next contended that the court erred in unduly restricting appellant's cross-examination of two witnesses. It is argued that wide latitude should be allowed in cross-examination, and that the court sustained objections to numerous questions on the ground they had been previously asked and answered. The cross-examination of these witnesses, to which appellant makes only a general reference, takes up 252 pages of the transcript, more than 100 pages being by appellant's counsel, and no specific matter is pointed out. A reading of that part of the record discloses neither error nor prejudice.

It is next contended that the court abused its discretion in not permitting appellant to recall the witness Franks for further cross-examination. The record discloses, in this connection, that the court told counsel that if there was anything he had failed to go into on cross-examination it would be allowed, and added "but if you merely wish to go over" some of the things already covered he saw nothing to be gained. Counsel then stated that Franks had said he first heard of Shaw on January 2 and "I want to prove that this man had lunch with Alvin Shaw on December 31, 1952." The court told counsel he was at liberty to do this by direct examination or by other witnesses, but not by arguing with Franks.

It is next contended that the court erred in refusing to allow appellant to examine the tape recordings after they were admitted into evidence and before they were played to the jury. These recordings were made available to him for private examination shortly after they were played to the jury, and no claim is made that anything was discovered which would have had any effect on their authenticity, or which could have affected the verdict if it had been discovered sooner. Nothing material to the case is pointed out and no prejudice appears.

It is next contended that the court erred in not permitting the appellant to cross-examine the sheriff on his notes of the conversations on January 19 and 20. It is argued that he was entitled to such a cross-examination in order to determine whether the notes complied with section 2047 of the Code of Civil Procedure, and that he was limited "to merely an examination on voir dire." The record shows that there was

a searching examination on *voir dire* and appellant points to no question as having been erroneously disallowed. After the examination on *voir dire* had been finished counsel for the appellant said: "The defendant Eads has no objection to him referring to his notes." Later on, the court allowed counsel for the appellant to examine the witness at considerable length. The court let most of this in, but with respect to one or two questions said they were not proper on *voir dire* but could be asked on cross-examination. If the court later prevented cross-examination in this connection it is not pointed out by the appellant.

It is next contended that it was error to allow the sheriff to testify from his notes, and that since these notes were merely his interpretation of the tape recordings it was error to exclude appellant's interpretation of the recordings. It is argued that these notes were transcriptions from the tape recordings, were not prepared by the witness when the facts were fresh in his memory, and were merely the witness' interpretation "of the testimony contained on the tape recordings." The sheriff testified that he had heard these conversations; that the recordings were a correct reproduction of the conversations; that the tape recordings were transcribed under his direction; and that he had added pencil notations of his own. The witness had heard the conversations and merely used the notes to refresh his recollection in part, and the notes thus used were not merely his interpretation of the recordings. Moreover, the appellant's counsel stated that he had no objection to this reference to the notes.

It is next contended that the court erred in commenting upon the evidence in one instance without, at that time, instructing the jurors that they were the sole and exclusive judges of the weight and credibility of the evidence. In the instance referred to, the sheriff had testified with respect to his conversation with the appellant after the other defendants were removed from his office. Later, the court stated that this conversation was not admitted against the other defendants and that the motion to strike as to those defendants would be granted "for the reason that all that conversation could possibly show would be a possible consciousness of guilt on the part of the defendant Eads or an admission against interest which would not be binding on the other defendants under any circumstances." A little later counsel asked the court to instruct the jury at that time to disregard this comment. The court stated that he would

instruct the jury in this regard at the conclusion of the case. This was done, the instructions in that respect being very full and complete. The comment in question was a mild statement of what the evidence might tend to show and was made in giving the reason for granting the motion to strike. No valid reason appears why the general instructions in that connection, given at the conclusion of the case, did not effectively protect the rights of the appellant and it cannot be held that reversible error appears.

■ It is next contended that the court erred in refusing, during the trial, to instruct the jury that evidence admissible as to certain defendants was not admissible as to all defendants, and in failing to instruct the jury to disregard all evidence which was stricken, at the time it was stricken. It is argued that evidence was received of the conversation of other defendants made out of the presence of the appellant, that this evidence was not admissible as against the appellant, that the court's failure to so instruct the jury at the time had the effect of leaving the damaging effects of such evidence in the minds of the jurors, and that this effect could not be removed by the instructions given at the conclusion of the trial. The evidence thus referred to consists of statements made by other defendants at a time which the jury could reasonably have found was during the existence of a conspiracy and made in furtherance of its objects, and this evidence was admissible as against the appellant. The court instructed the jury that the declaration of an alleged conspirator could not be considered against any other alleged conspirator, unless and until the alleged conspiracy was proved to have been in existence at the time of the declaration. The jury was also instructed to disregard any and all evidence which had been stricken. No error appears in this connection.

■ It is next contended that it was error for the court to fail to instruct the court reporter to transcribe the tape recordings as they were played to the jury. It is argued that these recordings were in the nature of testimony, that section 269 of the Code of Civil Procedure requires that all of the testimony be taken down in shorthand, and that while some portions of the recordings were unintelligible and inaudible the recording should have been taken down and these portions noted. When the witness was asked to play the recording to the jury the objection made was that counsel had not been allowed a prior hearing of the tape, and that the witness was

not qualified as an expert in the operation of such a machine. The court overruled the objection stating that this was an exhibit in the case which the jury could have replayed as many times as it desired in order to hear it all, and then told counsel that they could likewise have the exhibit replayed, and compare it with the transcriptions. The recordings were then played and, after a recess, counsel asked that so much of the recordings as was intelligible be reported by the court reporter. The court then told counsel that the exhibit was admitted with their consent, and was played at the earliest convenient moment in accordance with their request; that they could have it replayed at any time; that if they had a witness who could operate the machine better they could have him play it again for the jury or they could hear it in private; and that "if counsel want the court reporters to transcribe so much of the tape recording as they can get from hearing it they may copy all such portions of the exhibit as they can get into the record." It does not appear that the court's suggestions were complied with; that any effort was made to utilize the methods of augmenting the record provided by the Rules on Appeal; or that the taking of this down by the reporters at the time would have added anything to the transcriptions of the recordings as they were put into the record. Neither error nor prejudice appears.

It is next contended that the district attorney was guilty of prejudicial misconduct in attempting to introduce evidence of other crimes committed by the defendant Parker. It is argued that this reflected on the appellant, and the impression on the minds of the jurors could not be removed by any instruction to disregard it. The evidence thus referred to consisted of one statement made by Parker to a police officer. A motion to strike was granted and the court immediately instructed the jury to disregard it telling them, among other things, that it was offered only as against the defendant Parker and that it could not possibly be construed as binding on any other of the defendants. At the conclusion of the case the jury was again instructed to disregard any testimony which had been stricken. No misconduct appears, and the instructions were sufficient to remove any indirect harm to the appellant if such there was.

It is next contended that the evidence conclusively shows that the appellant was entrapped into conspiring to offer a bribe to the sheriff. It is argued that the conversations between Bilbrey, Shaw and Franks up to January 15 were

concerned only with the possibility of opening up gambling in Palm Springs; that it was not until January 15 that the matter of bribing the sheriff was mentioned, and it was then first mentioned by Franks who said that the sheriff wanted $1,500 in advance; that the testimony of the sheriff and the recordings show that the conversation of the sheriff, while the parties were in his office, was directed toward getting the defendants to make a specific offer of money; that the evidence shows that the sheriff intended to entrap the defendants into making an offer of a bribe, which they had no intention of doing; and that the only guilty intent disclosed by the evidence originated in the minds of the officers. It is unnecessary to review the evidence in this connection. The question of entrapment was one of fact for the jury and, in submitting it to the jury, the court gave five instructions which fully and completely covered the law in this connection. Under the established rules the evidence amply supports the jury's finding in that regard. (*People* v. *Braddock,* 41 Cal.2d 794 [264 P.2d 521].)

It is next contended that the court erred by instructing the jury on immaterial matters. It is argued that three instructions relating to gambling were immaterial, and that another instruction on "attempt" was unnecessary. ██ The first three of these instructions defined the offense of gambling, described the duty of the sheriff with respect to arresting persons who are committing public offenses, and told the jury that these instructions were not intended to suggest that any violation of the gambling laws was here charged but were given to assist in determining whether the actions charged in the indictment, if committed, might or could tend to influence the sheriff in connection with his official duties. These instructions were material to the issues. The instruction on attempt was a part of an instruction on intent. Assuming that it was unnecessary, no harmful effect appears.

██ The next contention, that the court erred in instructing the jury on circumstantial evidence, is without merit. The complaint is that the court refused to give certain instructions, and modified others, which were offered by the appellant. The court gave complete instructions on this matter which fully covered every element contained in the refused instructions, with the sole exception that they did not mention the appellant by name.

██ It is next contended that the court erred in refusing to give an instruction setting forth the rule that the testimony

of an accomplice must be corroborated. It is argued that the testimony of Franks raised the question as to whether, even though he was acting as a police officer, he was not also acting as an accomplice; and that Shaw's testimony that Franks first approached him with an offer to "fix the top man" discloses the necessity for this instruction on corroboration. There was no evidence which would have supported a finding that Franks was an accomplice, and it was unnecessary to give this instruction. If it could be assumed that any corroboration was necessary, the record discloses an overwhelming amount of corroboration and no possible prejudice appears.

It is next contended that the court was guilty of prejudicial misconduct in certain remarks made to defense counsel. Admitting that these remarks were made to counsel for the codefendants, it is argued that they would naturally be taken by the jury as reflecting on the appellant, since this was a conspiracy trial. We have carefully read each of the 22 citations to the record thus made, and find no possible prejudice in any of them. Most of them are trivial, all were justified by the circumstances, and some were made when the jury was not present. In one instance, under great provocation, the court said: "The unfortunate thing about it, under the rules apparently only the district attorney and the court can commit error. Defense counsel repeatedly does it here. I want no more of it. Now proceed." Shortly thereafter the court struck these remarks from the record and instructed the jury to disregard them. No prejudice appears, and the record discloses that the trial judge displayed, throughout the trial, a degree of patience under trying circumstances which comes close to setting a record.

The final contention is that since the jury was unable to agree on a verdict on the second count, the verdict on the first count is inconsistent and cannot stand. It is argued that the first count sets forth the same overt act, the offer of a bribe, which was alleged as a separate offense in the second count; that the jury in effect found that no bribe was offered; and that the disagreement on the second count was tantamount to an acquittal of the overt act alleged in the first count. Such cases as *Oliver* v. *Superior Court,* 92 Cal.App. 94 [267 P. 764], and *In re Johnston,* 3 Cal.2d 32 [43 P.2d 541], are relied on. In such cases there was an acquittal with respect to the controlling overt acts. Here, there was no acquittal with respect to the substantive offense,

and no finding by the jury that there was no offer of a bribe. In alleging the overt act in the first count it was charged that the defendants offered on January 20, 1953, to deliver $500 to the sheriff on January 23 or 24, and to deliver other sums as they were permitted to engage in gambling activities. In the second count it was charged that the defendants corruptly offered a bribe to the sheriff on January 20, with the intent to corruptly influence him in connection with a gambling scheme. While there is a close similarity in the charges thus made, the language used was not identical and may well have confused the jury. In disagreeing as to the second count the jurors may have felt that there was a technical difference between offering on January 20 to pay $500 at a future date, and offering a bribe on January 20. Or they may have been in doubt as to whether the evidence was technically sufficient to establish an actual and completed offer of a bribe on January 20. Also, some of the jurors may have felt, in view of the similarity of the charges, that it would not serve the interest of justice to convict the defendants on both. Whatever the jurors had in mind they did not acquit the appellant on the second count, but did find him guilty as charged in the first count, including the overt act. There was no finding that the defendants did not commit the overt act alleged in the first count. No fatal inconsistency appears which requires a reversal. The record conclusively shows the guilt of the appellant, and reveals no error which could reasonably be held to have resulted in a miscarriage of justice.

The judgment and order appealed from are affirmed.

Griffin, J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 28, 1954.