[Crim. No. 5678. Second Dist., Div. Three. Jan. 11, 1957.]

THE PEOPLE, Respondent, v. ALTON GORDON GARDNER, Appellant.

Simon & McKinsey, under appointment by the District Court of Appeal, and Harry J. Simon for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

VALLÉE, J.—By information defendant was charged in seven counts with robbery. He was convicted by a jury of the offenses charged in Counts I, III, IV, and V, and acquitted of the other three. He appeals from the judgment and the order denying his motion for a new trial.

### Count V

Gilbert Meischke was employed as a clerk in Benson's Liquor Store in Long Beach. About 1 a. m. on October 15, 1955, James Polk robbed him of $155. The first time Meischke saw defendant was in a police lineup.

### Count IV

Fred Stager managed the Sands Bar & Café in Long Beach. About 12:30 a. m. on October 20, 1955, James Polk and Billy Gardner, brother of defendant, robbed him of $189 and his wallet containing $10 or $12. As they left one of them fired a shot into the ceiling. A Mercury was parked in front of the bar. No one saw defendant in the bar that night. The first time Stager saw defendant was at a police station.

### Count III

Claude Heater operated Jack's Liquor Store in Long Beach. About 1 a. m. on October 27, 1955, he was getting ready to close. There was a customer in the store. Heater testified defendant entered the store and asked for a package of cigarettes; as he reached for the cigarettes defendant pulled a gun on him and told the customer, "You stay where you are. Don't you make a move"; defendant ordered Heater to open the cash register; he did, and defendant took $44 from it; defendant slowly backed out of the door and across the front of the store; there was a car parked outside with the motor running; defendant was very agile, he walked with a steady gait, nothing unusual struck him about defendant's walk except that he "moved awfully slowly." Heater identified defendant from others in a police lineup.

## Count I

James Browning operated a grocery store in Long Beach. About 11:30 a. m. on November 28, 1955, one Robertson robbed him of $93 in the store. Robertson left the store, followed by Browning. Before leaving, Browning told his wife to call the police. Robertson got into a new, cream-colored Mercury. Browning followed in his car. The Mercury stopped in front of an apartment house. The police arrived on the scene, entered the apartment house, saw Robertson, searched him and found $93 in his pocket. After the officers had taken the $93 from Robertson, one of them climbed to the roof on a ladder. Defendant was lying on his stomach at the edge of the roof. Glass in the skylight leading to the roof had been broken. The officer took defendant from the roof and had a conversation with him. The officer said, "Well, it looks like you got yourself in a pretty good mess this time," to which defendant replied, "It looks that way." Defendant told the officers he would tell the truth and said, "I did not know he was going to hold up that market [Browning's—Count I]. He told me to stop, that he wanted some cigarettes," that when Robertson returned from the market he (Robertson) said, "I just held up that market. Let's go." An officer testified: "Q. Following that conversation what next occurred? What was said and done within your immediate sight and hearing? A. I recall after that statement he stated that he was trying to get into the apartment, that Robertson had already succeeded in getting into the apartment through the skylight, and that he was entering and that he observed a motor officer approaching and went and hid on the roof. Q. Did you ask him why he hid when he saw a motor officer arrive? A. Yes. Q. What did he say to that? A. He said, 'I was scared.' Q. Did you ask him what he was scared of? A. Yes. Q. What did he say to that? A. Being caught. Q. Did you ask him why he was, why he was afraid of being caught? A. He stated that the situation probably looked bad and it would be figured that he had been in on the robbery." In the room occupied by Robertson the officers found a .38 Smith and Wesson revolver loaded with six shells. The officers called Browning into the apartment house. Defendant was sitting on the floor. Browning had not seen him in the grocery store. Defendant was then taken to the police station.

### Additional Evidence

At the police station defendant told an officer he had bought the new Mercury—he had traded his green '50 for it;

that he drove the car but did not know what was taking place; that Robertson came out "in a hurry, so I had to take off in a hurry."

On November 29, 1955, two officers talked to defendant. He told them he would plead guilty if he could get the same deal as the other defendants in the case were getting (plead guilty to one offense), his "priors" were not charged, and he would get a county jail sentence. One of the officers told him they were not making deals.

Later that day the officers talked to Polk, Billy Gardner, Robertson, and defendant together in the interrogation room of the jail. Defendant refused to answer any questions, saying, "I have nothing to say." Billy Gardner said he and Polk held up the Sands bar (Count IV); Polk fired a shot into the ceiling as they left; defendant was waiting outside in his Mercury; after the robbery they went to Polk's apartment and divided the $190 three ways; defendant received one-third. Polk stated that what Billy Gardner had said was "all true." Polk said defendant had been living with him; he had held up Jack's Liquor Store (Count III); he took $45 from the cash register; defendant was driving the getaway car and knew he was going to hold up the store; immediately after the robbery they split the money "50-50." An officer then said to defendant, "Q. Al Gardner, have you got anything to say about this?" to which defendant replied, "No." Polk said he had held up Benson's Liquor Store (Count V); he took $140 from the cash register; defendant knew he was going to hold up the place and waited outside in his Mercury; after the robbery he split the $140 with defendant. The officers then asked defendant if he had anything to say, to which he replied, "No."

An officer then removed defendant from the interrogation room. In the elevator going up to the jail the officer asked him "if these other boys were lying." Defendant "sort of grinned" and said he would like "to have a deal where he could get a County Jail sentence." The officer told him that was up to the court. After further conversation the officer asked defendant "if what they said about him was true," to which defendant replied, "Yes, it is all true." Defendant was then returned to the interrogation room and in the presence of the officers, Polk, Billy Gardner, and Robertson the following conversation between one of the officers and defendant occurred: "Q. Now, all that they said in

your presence a while ago, are those statements true? ALTON GARDNER: True.''

One of the officers had several conversations with defendant about the Mercury. Defendant first told the officer he bought it at a used car lot; the price was $3,200, and he had traded in another Mercury. Later the officer asked him if he had not stolen the Mercury in South Gate near the General Motors plant. Defendant replied that he had and that he had ''doctored'' the ownership certificate to fit the Mercury and put it in the window of the car.

Defendant's first assignment of error is that the evidence is insufficient to sustain the verdict as to Count III, robbery of Jack's Liquor Store. The contention is that the testimony of Claude Heater identifying defendant as the robber is so inherently improbable as to be unbelievable. The contention is predicated on the following: Uncontradicted evidence of a physician that defendant sustained a compound fracture of his left tibia on July 1, 1955, and that it was placed in a nonweight-bearing cast; on October 7, 1955, the fracture ''had not healed very much''; it would not have healed very much by October 27, 1955 (date of robbery of Jack's) and defendant would not then have been able, without a cast, to bear the weight of his body unaided by crutches. Testimony of the customer who was in the store at the time of the robbery that defendant was not the robber. Testimony of Heater that at the time of the robbery he thought defendant was very agile, had a steady gait, and there was nothing unusual about his walk, and that he (Heater) was under medical care at the time of the trial.

■ A reviewing court cannot reject testimony of a witness that has been believed by the trier of fact unless it is a physical impossibility that it be true, or its falsity is apparent without resorting to inferences or deductions. (*People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758].) ■ In order to say that testimony is inherently improbable it must appear that what was related or described could not have occurred. Testimony which is subject to justifiable suspicion is not inherently improbable. (*People* v. *Dragoo,* 121 Cal.App.2d 322, 324 [263 P.2d 90].) ■ A reviewing court will not hold unsupported a jury's finding of guilt merely because it might reasonably draw an inference different from the one the jury reasonably drew or might not be convinced beyond a reasonable doubt of the guilt of defendant. (*People* v. *Tollack,* 105 Cal.App.2d 169, 172 [233 P.2d 121]; *People* v.

*Cahan,* 141 Cal.App.2d 891, 897 [297 P.2d 715].) Our function is to determine whether the evidence, if believed, is of sufficient character to justify a conviction. We cannot say as a matter of law that the identification of defendant by Heater is so inherently improbable as to be unbelievable. Further, the jury may have disregarded the identification of Heater and concluded defendant was the driver of the getaway car.

The court gave seven instructions on the subject of conspiracy at the request of the People. They defined a conspiracy; stated that after a conspiracy has been proved each member is liable for and bound by the acts and declarations of each and all the conspirators; stated the manner in which a conspiracy may be proved; stated that the jury should determine from the facts and circumstances shown by the evidence "whether or not a criminal combination or agreement did in fact exist as charged in the case"; defined an overt act; and stated that no agreement amounts to a conspiracy unless an overt act is done by one or more of the conspirators for the purpose of accomplishing the object of the agreement and that an overt act "must be proved to support a conviction for conspiracy." They referred to an "alleged conspiracy," an "alleged conspirator," to a "conspiracy as alleged." Defendant asserts that since he was not charged with a conspiracy the court erred in giving these instructions.

 Since defendant was not charged with conspiracy and since these instructions were poorly worded, they could well have been omitted. (*People* v. *Talbott,* 65 Cal.App.2d 654, 664-665 [151 P.2d 317].) However, we do not think defendant was prejudiced. The evidence was sufficient to warrant the jury in concluding that a conspiracy to commit robberies existed between Polk, Robertson, Billy Gardner, and defendant. As a general rule evidence of a conspiracy is properly admissible even though a conspiracy is not charged in the information. (*People* v. *Rivas,* 92 Cal.App.2d 663, 667-668 [207 P.2d 1062].) When the evidence is sufficient to warrant a finding of a conspiracy, appropriate instructions on the subject may be given. (*People* v. *Weaver,* 56 Cal.App.2d 732, 740-741 [133 P.2d 818].) The jury was well aware that defendant was not charged with conspiracy. On *voir dire* examination the court told the jurors defendant was charged with seven counts of armed robbery. The clerk read the information to the jury. The verdict forms related

to robbery, not conspiracy. It is evident the jury was not confused or misled by the instructions on conspiracy.

The court instructed the jury relative to confessions and admissions.[1] Defendant claims "there was no actual confession in the case," hence it was error to instruct on the subject of confessions. We find no error. ▆ The instruction correctly defines a confession and an admission. (*People* v. *Connelly,* 195 Cal. 584, 597 [234 P. 374]; *People* v. *Chan Chaun,* 41 Cal.App.2d 586, 593 [107 P.2d 455].) It left the questions whether a confession had been made, and if so whether it was true, to the jury. There was no error in giving the instruction. It did defendant no harm.

The conversations which took place on November 28, 1955, between the officers, Polk, Billy Gardner, Robertson, and defendant in the interrogation room were taken down in shorthand and transcribed by two court stenographers. Officer Decker, who was present during all the conversations, was called by the People. He testified: he read a typewritten transcript of the conversations the next day; the transcript accurately recorded the conversations; he cannot, without referring to the transcript, narrate accurately the conversations; he is unable to remember them; he would have to refresh his memory; his memory as to what they were is "in the most part" completely gone; he has no independent "memory and recollection of the conversation"; he could relate some of the conversations but "I doubt if it could be wholly correct to my recollection"; his use of the transcript would

---

[1] "Evidence has been received in this case tending to show that on an occasion other than this trial the defendant himself made a statement relating to the issues in this case.

"[A statement thus made by a defendant may be either a confession or an admission.]

"A confession is a statement that was made by one who is a defendant in a criminal trial, at a time when he was not testifying in that trial, by which he acknowledged certain conduct of his own that constituted a crime for which he is on trial, a statement which, if true, discloses his guilt of that crime and excludes the possibility of a reasonable inference to the contrary.

"If under my instructions you find that a voluntary confession was made, you are the exclusive judges as to whether or not the confession was true; and in deciding that question you should consider all the circumstances connected with the making of the statement, as shown by the evidence.

"[An admission is something less than a confession in that it does not concede so much pointing toward defendant's guilt, and does not alone, even if true, support a deduction of guilt. It may consist of any statement or other conduct by a defendant whereby he expressly or impliedly acknowledges a fact that contributes in some degree to the proof of his guilt of an alleged crime for which he is on trial, and which statement was made or conduct occurred outside of that trial.]"

be merely to refresh his recollection. Over defendant's objection Officer Decker was then permitted to read aloud the transcript of the conversations which took place in the interrogation room in the presence of defendant. The transcript was not admitted in evidence.

Defendant asserts it was error to allow the transcribed conversations to be read verbatim to the jury. He argues its "proper use could only be (1) to refresh the memory of the witness, if he had a memory, or (2) to allow a witness *without memory*, to read it and thus testify from it; *provided,* in both cases, the document meets the requirements of Code of Civil Procedure, section 2047.[2] Unless it is made to appear that the memorandum complies with the requirements of the statute, the witness may *not* use it to refresh his memory or testify therefrom"; that the transcript does not meet the requirements of section 2047 in that it appears the witness did not prepare it and it does not appear that it was prepared under his direction.

*Carpenter* v. *Ashley,* 16 Cal.App. 302 [116 P. 983], was an action for slander. The defendant, a district attorney, was a witness in his own behalf. He was asked to narrate the colloquy occurring between him and the plaintiff during which the alleged slanderous words were uttered. He testified that he, as district attorney, directed the official reporter to take down the testimony of the witnesses and what occurred during the colloquy and that the reporter did take down all that was said and wrote it out soon thereafter and that he, the witness, examined the transcription; that it was a true and correct statement. He was then permitted to refresh his memory from it. The ruling was held not to be error.

In *People* v. *Amaya,* 44 Cal.App.2d 656 [112 P.2d 942], Mr. Justice McComb wrote (p. 658):

"Deputy Sheriff Morrell, who spoke Spanish as well as English, questioned appellant, after his arrest, partly in English and partly in Spanish. The questions and answers as

---

[2]Section 2047: "A witness is allowed to refresh his memory respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing. But in such case the writing must be produced, and may be seen by the adverse party, who may, if he choose, cross-examine the witness upon it, and may read it to the jury. So, also, a witness may testify from such a writing, though he retain no recollection of the particular facts, but such evidence must be received with caution."

interpreted by Deputy Sheriff Morrell were reduced to writing by a stenographic reporter. Thereafter at the time of the trial Mr. Morrell used, for the purpose of refreshing his recollection as to his conversation with appellant, the transcribed notes of the reporter. This procedure was proper. Mr. Morrell stated when questioned by the district attorney that it was necessary for him to use the memorandum for the purpose of refreshing his recollection. This was sufficient foundation, together with the showing as to the method of preparation of the notes to permit Mr. Morrell to use the memorandum in testifying as to the statements made by appellant in his presence. The law is established that one who is present at a conversation and has heard the same and knows the facts may use any writing whether made by himself or another to refresh his memory when subsequently testifying (Code Civ. Proc., § 2047; *Beecham* v. *Burns,* 34 Cal.App. 754, 758 [168 P. 1058]; *People* v. *Lee Fat,* 54 Cal. 527, 531; see, also, 27 Cal. Jur. (1926) 88, §§ 68 and 69; vol. 7, No. 5, February, 1941, p. 315, Current Legal Thought).'' (Also see *Estate of Moore,* 180 Cal. 570, 584 [182 P. 285]; *People* v. *Vera,* 131 Cal.App.2d 669, 674-676 [281 P.2d 65]; *People* v. *Eads,* 124 Cal.App.2d 393, 400 [268 P.2d 561]; *People* v. *Sica,* 112 Cal.App.2d 574, 586-587 [247 P.2d 72]; *People* v. *Burns,* 109 Cal.App.2d 524, 539-540 [241 P.2d 308, 242 P.2d 9]; *People* v. *Deckert,* 77 Cal.App. 146, 151 [246 P. 157]; *People* v. *Brown,* 3 Cal.App. 178 [84 P. 670].)[3] **[10]** A witness who has no present recollection of the facts and is permitted to refresh his memory from a memorandum may, in testifying to the facts, read directly from the writing. (*Anderson* v. *Souza,* 38 Cal.2d 825, 832-833 [243 P.2d 497]; *People* v. *Vera,* 131 Cal.App.2d 669, 675-676 [281 P.2d 65].) The court did not err in permitting Officer Decker to refresh his memory from the transcriptions of the conversations and to read directly therefrom.

 The court declined to give an instruction with respect to circumstantial evidence requested by defendant.[4] Error

---

[3]Theoretically it should make no difference what is used to refresh the recollection of a witness. A witness should be permitted to use anything which has some logical tendency to stimulate his memory. (3 U.C.L.A. Law Rev. 616, 627; 24 Mich.L.Rev. 420; 17 Ore.L.Rev. 78; 9 Kan. Bar Assn. Jour. 296.) However, legislation would be necessary to change the rule in California.

[4]''When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt.''

is claimed. The connection of defendant with the offenses charged in Counts IV and V was based entirely on circumstantial evidence. It was therefore error to refuse to give the instruction. (*People* v. *Watson,* 46 Cal.2d 818, 829-832 [299 P.2d 243].) █ The court instructed with respect to the presumption of innocence; the burden of proof; reasonable doubt; direct and circumstantial evidence, equally entitled to consideration; definitions of direct and circumstantial evidence; where the evidence is susceptible of two constructions it is the jury's duty to adopt that construction which admits of defendant's innocence; and that the jury was not permitted on circumstantial evidence "to find the defendant guilty of any crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion." Under these circumstances it does not appear in the present case that the court's refusal to give the instruction requested resulted in a miscarriage of justice.

█ Next defendant contends the evidence is insufficient to sustain the convictions of the charges in Counts IV (robbery of Sands bar) and V (robbery of Benson's Liquor Store). He concedes the corpus delicti as to these counts was clearly proved but argues that his connection with each robbery "hangs by two thin threads"—his alleged conversations related by the officers, and his statement that what the robbers said was "True." The evidentiary effect of the so-called "thin threads" was for the jury. The evidence was sufficient.

Lastly it is contended the prosecutor was guilty of prejudicial misconduct in his argument to the jury. The parts of the argument complained of are set out in the margin[5]

---

[5] "I don't know a fair way to present it. I can't make this explanation to you because I don't know what goes on in that defendant's mind, but we do know this, and you people know it, he decided apparently some time or other that he was not guilty for one, or he may do like so many people do, come to a jury in spite of this tremendous evidence against him when they don't have the nerve to plead guilty and do a fair thing, wait to see if a jury would be gullible enough, in spite of the physical evidence and the oral evidence which I have just reread to you here against them, or maybe that they will feel that now, upon a demonstration of a claim of illness, crippleness, and so on, a jury will get sympathetic and decide it could not happen that way and a crippled fellow could not do it."

"Let us get down to merry old England. He says in England the prosecutor is bound to turn over evidence to the counsel if it proves innocence. We have a slightly different system in this country, but it is

██ No objection was made to the argument at the time. It was not assigned as misconduct, nor was the court requested to admonish the jury to disregard it. This is not a case in which the argument was such as not to require an assignment of misconduct and a request for an admonition or instruction. We find nothing prejudicial in the argument. ██ Defendant also asserts misconduct because the prosecutor held a gun, which was in evidence, before the jury during part of his argument. In view of the nature of the evidence there was nothing improper in his doing so.

We find no prejudicial error in the record.

The judgment and the order denying a new trial are affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

---

just as effective and I don't want you to take this by way of personal opinion in this case, and sometime later I will tell you why I don't give jurors opinions. The reason we don't necessarily do that in this country in America the case is a simple one. We don't have to prosecute the cases where the evidence proves innocence. You have the same results by not even starting the prosecution.''

''That is difficult, because I have to hedge, keep to 38 or something cases to get to the things that are permitted in this case. In fairness to Mr. Simon, it is the duty of the attorneys who represent the respective clients that you see before you here, to as far as possible prevent mistakes.''

''The defendant is there with them. 'Now, you just heard what your pal said, what have you got to say about it?' 'I ain't saying nothing.' That is the gist of it, the vernacular of it, he is given a fair opportunity, as that instruction that Mr. Simon referred to gave you, and he wants, in connection with that talk about this instruction, that has to do with pain and suffering and advice of counsel. The defendant probably knows the law of self-incrimination as well as any Fifth Columnist to hear him talk. You and I know that, too.

''If one of you citizens were interrogated by some officer, you would tell him the truth, because you have nothing to tell. It is all well and good that the law provides for Fifth Columnists or under investigation to take that attitude. We believe in the Constitution. We still have to be realistic to this extent, when a person is accused, is given a fair opportunity to give an explanation and fails to do so, the law, in its wisdom, says any trier of fact—it can be a judge without a jury, it is again a privilege of the defendant.''