[Crim. No. 8442. Second Dist., Div. Three. July 24, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES ANDREW KING, Defendant and Appellant.

Elinor Chandler for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—In the first count of an information the defendant was accused of the crime of violation of section 93 of the Penal Code.[1] In the second count he was accused of the crime of violation of section 96 of the Penal Code.[2] He was found guilty with respect to each charge in a trial by jury. His motion for a new trial was denied. The proceedings were suspended without the imposition of sentence and he was placed on probation for a period of three years on certain terms and conditions, one of the conditions with respect to the first count being that he spend 180 days in the county jail. (See Pen. Code, § 1203.1.) While the notice of appeal makes reference to "all motions, orders and judgments of the Court made on May 11, 1962," the date upon which probation was granted, we treat the appeal as being one from the judgment (order granting probation) under the provisions of section 1237 of the Penal Code.[3]

▉▉▉ The defendant was a juror in the trial of a civil action for the recovery of damages brought by Joseph Granone and Edward Tsuruta, who did business as partners

---

[1]Section 93 of the Penal Code is as follows: "Every judicial officer, juror, referee, arbitrator, or umpire, and every person authorized by law to hear or determine any question or controversy, who asks, receives, or agrees to receive, any bribe, upon any agreement or understanding that his vote, opinion, or decision upon any matter or question which is or may be brought before him for decision, shall be influenced thereby, is punishable by imprisonment in the State Prison not less than one nor more than ten years."

[2]Section 96 of the Penal Code is as follows: "Every juror, or person drawn or summoned as a juror, or chosen arbitrator or umpire, or appointed referee, who either:

One.—Makes any promise or agreement to give a verdict or decision for or against any party; or,

Two.—Willfully and corruptly permits any communication to be made to him, or receives any book, paper, instrument, or information relating to any cause or matter pending before him, except according to the regular course of proceedings, is punishable by fine of not exceeding five thousand dollars, or by imprisonment in the State Prison not exceeding five years."

[3]Section 1237 of the Penal Code is in part as follows: "An appeal may be taken by the defendant: 1. From a final judgment of conviction; a sentence or an order granting probation shall be deemed to be a final judgment within the meaning of this section; . . ."

The order denying the defendant's motion for a new trial was not an appealable order. (Pen. Code, § 1237.)

under the name of Atlas Farms, against the County of Los Angeles and the Shell Oil Company. The trial was of long duration. The defendant's service as a juror in the case commenced on November 1, 1961. He was excused from that duty on January 8, 1962.

Mr. Granone, one of the plaintiffs in the civil case, testified that he lived on a truck farm, known as Atlas Farms, in Long Beach. The action involved damage to the property and the crops thereon. While Mr. Granone had observed the defendant acting as a juror in the courtroom, he was not otherwise acquainted with him. On Friday, December 29, 1961, Mr. Granone arrived home about 6 p.m. A short time later he received a telephone call. He could not identify the voice of the person who called as that of the defendant.[4] That person asked him, ''Are you the Mr. Granone that has the case against the County of Los Angeles and the Shell Oil Company?'' He answered that he was. The caller asked whether the line was tapped and then said, ''Your case against the Shell Oil Company is down the drain, but for peanuts, just peanuts, the other case can be turned your way.'' Thereafter the caller said, ''Well, I guess you want to talk it over with your partner.'' Mr. Granone answered, ''Yes.'' The unidentified person then said, ''In case you care to follow up or do something about it, you put an ad in the Huntington Park News or Chronicle stating that you are interested in acreage in Arkansas.'' Mr. Granone further testified that he did not ''remember exactly whether he said Signal or whether he says [sic] Chronicle,'' but a Huntington Park newspaper was mentioned.

Mr. Granone informed the office of the district attorney that he had received the call. Thereafter he placed an advertisement in the Huntington Park Daily Signal which was worded as follows: ''Atlas Farms interested in acreage in Arkansas. Call NE 2-3898 Aft. 6 p.m.'' The advertisement appeared in the issue of January 3, 1962. On the evening of January 3, Mrs. Granone informed him that a telephone call had been received in his absence. On January 4, he returned the call by dialing the number which his wife

[4]When Mr. Granone was asked to compare the voice of the person who made the telephone call to him on December 29, 1961, with that of the defendant, part of his testimony was as follows: ''Well, the dialect was the same but it was quite a bit coarser. . . . Could have been camouflaged; higher, coarser, like a more hoarse voice.'' When asked if it was the defendant's voice, he answered: ''I don't know.''

had been given. With Mr. Granone's consent two investigators from the district attorney's office recorded the conversation. He recognized the voice of the person who answered the telephone as that of the defendant. Mr. Granone testified that he had examined a transcription of the recorded conversation when the matter was relatively fresh in his memory and that he had found the transcription to be substantially accurate. At the time of the trial he was unable to recall all of the conversation. Over objection, he was permitted to testify by reading the transcription. (Cf. *People* v. *Gardner,* 147 Cal.App.2d 530, 538-540 [305 P.2d 614].)

The conversation on January 4 as related by the witness was in part as follows (the language of Mr. Granone being indicated by the letter "G" and that of Mr. King by the letter "K"): "K: Hello. G: Hello. Is this Mr. King? K: Yes, it is. G: This is Joe Granone, Mr. King. K: Hey, hi there, Joe. How're you doing? G: Can't complain, I guess. Say, I put that ad in the paper. K: Yeah, my wife . . . picked that up last night and she marked it. I thought that's what it was, but the lady answered . . . *and so I sez that wasn't Joe Granone*——. . . . G: You are the same Mr. King who called me last Friday, huh? K: I called you last night. G: Yeah. Last Friday. K: *No, I — I tell you what that was, Mr. Granone; that was a friend of mine*— G: Oh —— K: —— and he . . . overheard us talking and . . . he told me yesterday morning . . . and he said that . . . he'd called and I said, oh, okay, so what?" Later in the course of the conversation Mr. Granone suggested that they meet at his place of business the next day, but Mr. King replied that if "*they see my car . . . see me . . . something like that at your place of business, why they would think there might be something crooked or something like that.*" Mr. Granone then suggested a meeting in front of his bank, but Mr. King asked if there was not a place near Mr. Granone's home where they might have "a Coke or a sandwich" on that evening. Mr. King further said that he could have his papers with him and tell Mr. Granone about the land. Mr. Granone stated, however, that he had another appointment that night. Mr. King said, "Well, tomorrow night—how about tomorrow night . . . *that thing isn't going to wind up tomorrow?*[5] *I know it can't possibly wind up tomorrow and there is no rush about it, I mean* . . . land . . . the value is not going to change

---

[5] January 4, 1962, was a Thursday.

—.'' King said that the land was 42 acres, that there were ''about four different ways'' it could be cut up, and that if he sold the back acreage he could ''sell the 20 acres flat for 1500.'' Mr. Granone suggested that they meet on Saturday at his ''place at the market.'' *But Mr. King said he would rather not go there, stating that ''somebody is going to think something if they see me and see my car.''* Finally, they agreed to meet in a restaurant at Atlantic and Firestone Boulevards at noon on Saturday.

After Mr. Granone had testified as to the conversation of January 4, 1962, the tape recording of that conversation was played for the benefit of the jurors.

On Saturday Mr. Granone went to the designated restaurant. The defendant did not appear. Mr. Granone was called to the telephone there and recognized the voice of the defendant who stated that he was at home and was sick. Later in the day Mr. Granone telephoned the defendant. The conversation was recorded by the investigators with Mr. Granone's consent. A written transcription of the recorded conversation was made which, Mr. Granone testified, accurately set forth the conversation. The witness could not give all of the conversation from memory, although he could recall the substance. Over objection, Mr. Granone was permitted to relate his discussion with the defendant by reading from the transcription. Mr. Granone requested that the defendant tell him what he wanted. The defendant replied that he had ''this 42 acres'' for which he wanted ''1500 down,'' with Mr. Granone having ''60 days to take up the option there.'' Mr. Granone said he was not interested in acreage and told the defendant to come to the point. The defendant replied that he was ''interested in selling acreage.'' Finally the defendant said, ''Well, I've got to have 1500 down.'' Mr. Granone said, ''Okay, then, Jim, . . . let's forget it,'' to which the defendant answered, ''Okay, Joe.''

After Mr. Granone had testified as to this conversation, the tape recording thereof was played.

Mrs. Granone was called as a witness. She testified as follows as to her telephone conversation on January 3, 1962, with a man who identified himself as Jim King: ''Well, he started the conversation by saying that he used to be a real estate salesman and that he had 40 acres of land for sale in Arkansas and he . . . was interested in selling the back half, which he referred to as 20 acres. And he told me

that he had gotten janitor work and he wouldn't get home in the evening until after 8:00 o'clock. If the party interested in the ad—not to call before 8:00 o'clock in the evening. And also that he had done five months of jury duty but that he wasn't doing jury duty now at the present. And that he lived in Cudahy.''

Clayton R. Anderson of the District Attorney's Bureau of Investigation testified as to a conversation with the defendant on January 8, 1962. The defendant's statements were made freely and voluntarily. He admitted that he had talked to Mr. Granone on the telephone on January 4 and January 6, 1962.

Mr. Anderson also testified that on Saturday, January 6, 1962, he saw Mr. King's automobile in the parking lot of the restaurant at which Mr. Granone was to meet Mr. King, but he could not identify the person who was in the vehicle. His attention was diverted and when he again made an observation the automobile was no longer in the lot.

The defendant testified in his own behalf. He said that he was "semi-retired" and that he was presently employed as a night watchman and janitor for an industrial concern. He had been a high school principal and teacher in Arkansas. After he came to California he worked as a real estate salesman. He made no telephone call to Mr. Granone on December 29, 1961, and did not cause anyone else to do so. He was not aware of such a call except that he had been told by the district attorney's investigators that such a call had been made. He and his wife had owned about 42 acres of land in Arkansas since June 30, 1959, and had attempted to make a sale of it. In December 1961 he was a candidate for the office of councilman in Cudahy. He testified that during November and December 1961 he told approximately two or three hundred people in Cudahy that he was a juror in the Granone case.

The defendant further testified that his wife first called his attention to the newspaper advertisement about acreage in Arkansas. The next morning (January 4), a person who identified himself as "Larry" or "Barry" telephoned him concerning the advertisement but did not mention the name of Granone. When he first talked to Mr. Granone on the telephone he did not know that he was talking to a person who was a plaintiff in the case in which he was a juror. On Saturday, January 6, he saw Mr. Granone approaching the restaurant and then realized that he was one of the plaintiffs

in the case. So the defendant drove back to his home and telephoned Mr. Granone at the restaurant.

On cross-examination, the defendant testified that the Huntington Park Signal was delivered to his house daily. He noticed that the advertisement about Arkansas land contained the words ''Atlas Farms.'' That name had been mentioned frequently in the course of the trial of the case in which he had served as a juror for approximately two months.

 The contentions made by the defendant on this appeal will be discussed. He asserts that it was error to permit Mr. Granone to testify as to the telephone conversation which he had on December 29, 1961, with an unidentified person. He argues that thereby hearsay was received as proof of the corpus delicti of a crime. That contention is not tenable. What was said in that conversation by the unidentified caller was in the nature of a solicitation of money in return for with that telephone call be established in some way before it could properly be considered as against him (see *People* v. *Weiss,* 50 Cal.2d 535, 553 [327 P.2d 527]), no violation of the hearsay rule was involved. It was stated in *People* v. *Henry,* 86 Cal.App.2d 785 [195 P.2d 478], at page 789: ''There is a well-established exception or departure from the hearsay rule applying to cases in which the very fact in controversy which influence was to be brought to bear upon the outcome of a pending lawsuit to which Mr. Granone was a party. is whether certain things were said or done and not as to whether these things were true or false, and in these cases the words or acts are admissible not as hearsay, but as original admissible against him, on the ground that since Dr. Bryan was unable to identify the voices he heard over the telephone, his testimony concerning the call is inadmissible hearsay. The testimony, however, to the effect that unknown persons posed as being able to obtain the release of Dr. Bry- Although it was necessary that the defendant's connection an's daughter for ransom, was offered merely to show that bases his contention that there was no competent proof of the corpus delicti and that therefore his admissions were not the conversation was held, and not to prove the truth of the statements made by the unidentified callers. Such evidence is not hearsay.'' A more recent discussion of the applicable law is found in *People* v. *Dalton,* 172 Cal.App.2d 15, 18-21 [341 evidence.'' In *Rogers* v. *Superior Court,* 46 Cal.2d 3 [291 P.2d 929], the Supreme Court stated at page 8: ''Petitioner

P.2d 793]. (See also *People* v. *Jones,* 205 Cal.App.2d 460, 467-468 [23 Cal.Rptr. 418].)[6]

The identity of a person who made a telephone call may be established by circumstantial evidence. (See *People* v. *McGaughran,* 197 Cal.App.2d 6, 16 [17 Cal.Rptr. 121]; *People* v. *Horace,* 127 Cal.App.2d 366, 369 [273 P.2d 923]; *People* v. *Goldstein,* 84 Cal.App.2d 581, 590 [191 P.2d 102]; *Cwach* v. *United States,* 212 F.2d 520, 525.) In like manner, the fact that the defendant knew of the telephone conversation of December 29, 1961, and had acted in concert with the person who made it, if he did not actually make the call himself, could be shown by circumstantial evidence. In view of the tenor of the defendant's statements in the telephone conversation of January 4, 1962, particularly those which have been placed in italics hereinabove, the jury was justified in finding that the defendant either caused the call to be made or knowingly made use of it for his own advantage in soliciting a bribe from Mr. Granone.

The defendant contends that there was insufficient evidence to sustain a conviction under either count. The test which must guide this court in the consideration of that contention is whether there was substantial evidence to support the conclusion of the trier of fact as to each count. (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911].) The solicitation of a bribe need not be stated in any particular language; such a solicitation may be in the form of words which carry the import of a bribe and were evidently intended to be so understood. (*People* v. *Bompensiero,* 142 Cal.App.2d 693, 706 [299 P.2d 725]; *People* v. *Vollmann,* 73 Cal.App.2d 769, 786 [167 P.2d 545].) The evidence and the inferences reasonably to be drawn therefrom gave substantial support to the determination that the defendant had asked Mr. Granone for a bribe in exchange for an agreement or understanding that his action as a juror in the determination of questions of fact in the pending case would be influenced thereby, as charged in the first count of the information. (See *People* v. *Squires,* 99 Cal. 327, 330 [33 P. 1092].) There also was substantial support for the determination that the defendant willfully and corruptly permitted a communication concerning the civil case to be made to him as a juror, as charged in the second count. It was a reason-

---

[6]The jurors were instructed that the conversation was not being offered as evidence of the truth of the matters asserted in the conversation.

able inference that he, knowing that the person to whom he was speaking was a party to the civil action, permitted himself to be addressed upon a subject which he realized did not relate merely to a sale of land in Arkansas but primarily involved the matter of the defendant's performance of his duty as a juror. It was a further reasonable inference that the defendant so conducted himself with a corrupt purpose.[7]

Inasmuch as proceedings were suspended without imposition of sentence and the defendant placed on probation, no question of double punishment of the defendant for his conduct is involved. (See *People* v. *McFarland,* 58 Cal.2d 748, 760-763 [26 Cal.Rptr. 473, 376 P.2d 449].)

Another contention of the defendant is that he was denied a fair trial in that he was not allowed to show that he had been "framed" because of his political activities in the area of Cudahy.[8] The testimony which he desired to offer related to threatening telephone calls made to him and to the intensity of feeling arising from gambling and political issues in the community where he resided. When the deputy district attorney inquired whether the defendant was going "to show any connection between these threats and what has occurred here," the reply of the defendant's counsel was as follows: "Nothing more than you have by your case. I can do nothing more than infer that this has happened before so it could happen again, and that this is part of our showing of frame-up."

In view of the nature of the evidence offered by the defendant, there was no error. The governing law is stated in *People* v. *Mendez,* 193 Cal. 39 [223 P. 65], at page 51: " 'It is always proper to show that some other person and not the defendant committed the crime with which he is charged.' [Citation.] The question herein is what kind and quality of evidence is essential to that end, . . . It seems clear that a defendant, in order to exculpate himself, should not

---

[7] " 'The word 'corruptly' imports a wrongful design to acquire or cause some pecuniary or other advantage to the person guilty of the act or omission referred to, or to some other person.'' (Pen. Code, § 7, subd. 3.)

[8] A portion of his brief is as follows: ". . . Mr. King was well known not only as being a juror on a trial in Los Angeles, but also as being a real estate man and a man who owned real estate in Arkansas and wished to sell it. This is a matter of common knowledge throughout the Cudahy area. Prior to the time that this phone call [of December 29, 1961] was made, Mr. King was harassed by not only vulgar and horrible phone calls, but by certain direct, damaging acts being taken in the direction of his person, attempting to get him to cease and desist running as councilman in Cudahy."

be required to establish the guilt of a third person with that degree of certainty requisite to sustain a conviction of the latter. On the other hand, it seems equally clear that evidence which simply affords a possible ground of possible suspicion against another person should be inadmissible. The decisions in other states are not completely harmonious upon this question. But they are substantially unanimous in holding that mere evidence of motive in another person, or of motive coupled with threats of such other person, is inadmissible unless coupled with other evidence tending to directly connect such other person with the actual commission of the crime charged.'' With respect to the same subject, it was said in *People* v. *Buono,* 191 Cal.App.2d 203 [12 Cal.Rptr. 604], at page 228: ''But the mere possibility that some third person did it is not enough. There must be some competent and substantial proof of a probability that this happened.'' (See also *People* v. *Landry,* 106 Cal.App.2d 8, 12 [24 P.2d 736].)

The defendant asserts that the district attorney interfered with his rights by excusing from attendance witnesses upon whom the defendant had caused subpoenas to be served. It is further asserted that the district attorney caused witnesses subpoenaed by the defendant to be prejudiced against him. The record, however, is devoid of any showing that the defendant was deprived of any relevant evidence. In the absence of any basis for a claim of prejudice, the contention cannot aid the defendant and does not merit extended discussion. (See *In re Finn,* 54 Cal.2d 807, 813 [8 Cal.Rptr. 741, 356 P.2d 685]; *People* v. *Casdorf,* 60 Cal.App. 106, 112 [212 P. 237].)

The judgment (order granting probation) is affirmed.

Shinn, P. J., and Files, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 18, 1963.